697 F.2d 104
 12 Fed. R. Evid. Serv. 381
 JOY MANUFACTURING COMPANY, a corporation Appellant in No. 81-2694
v.
SOLA BASIC INDUSTRIES, INC., a corporation, Lindberg
Division of Sola Basic Industries, Inc. and
General Signal Corporation, a corporation
Sola Basic Industries, Inc., a corporation; Lindberg
Division of Sola Basic Industries, Inc., Appellant
 in No. 81-2695.
 Nos. 81-2694, 81-2695.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 16, 1982.
Decided Dec. 30, 1982.
 
 Roger Curran (argued), Gail L. Gratton, Rose, Schmidt, Dixon & Hasley, Pittsburgh, Pa., for Joy Mfg. Co.
 Joseph M. Loughren (argued), Robert E. Wayman, Wayman, Irvin & McAuley, Pittsburgh, Pa., for Sola Basic Industries, Inc., Lindberg Division of Sola Basic Industries, Inc.
 Before ADAMS, HUNTER and BECKER, Circuit Judges.
 OPINION OF THE COURT
 JAMES HUNTER, III, Circuit Judge:
 
 
 1
 Joy Manufacturing Company ("Joy") brought this diversity action against Sola Basic Industries, Inc., Lindberg Division of Sola Basic Industries, Inc., and General Signal Corporation[1] to recover damages resulting from the failure of two heat treating furnaces purchased by Joy from the Lindberg Division of Sola Basic Industries.[2] The case was tried on the theories of breach of warranty and misrepresentation, and the jury returned a verdict in the amount of $7,968.31. Both parties filed timely appeals claiming various errors in the trial below. Because we find the district court erred in excluding certain evidence and in not allowing defendants to amend their pretrial statement, we will vacate the judgment and remand for a new trial.
 
 FACTS
 
 2
 In the mid-1970's Joy purchased two new heat treating furnaces from Lindberg for use in its Chain Plant Operation in Reno, Pennsylvania. The first was delivered on March 24, 1975 and, after assembly, was ready for normal operation in late May, 1975. The second was installed and ready for operation in July, 1976.
 
 
 3
 Both furnaces experienced operational difficulties[3] shortly after installation. These operational problems reoccurred at approximately six to eight week intervals, resulting in substantial downtime for both furnaces. From 1975 to 1977, both Joy and Lindberg made various efforts to correct the furnace problems with little success. Finally in 1977 the hearths in both furnaces were replaced and, with minor exceptions, the furnaces have since operated properly. App. at 22a, 23a.
 
 PROCEEDINGS BELOW
 
 4
 On March 23, 1979, Joy filed the instant action in the District Court for the Western District of Pennsylvania alleging breach of express and implied warranties, strict liability, negligence, and misrepresentation on the part of Lindberg. Joy sought damages in excess of $800,000.
 
 
 5
 In a pretrial notice dated April 23, 1979, the district court directed counsel for both parties to comply with the provisions of the Rule 5-II Pre-Trial Procedures of the District Court for the Western District of Pennsylvania. Under that rule each party is required to submit a "brief narrative statement of the material facts [to be offered] at trial." Plaintiffs must include "all damages claimed, the method of calculation, and how damages will be proven," and defendants must include all "defense[s] to the damage claims." W.D.Pa.R. 5-II(D). In its pretrial narrative, Joy discussed the factual background leading up to its filing of this action and repeated its claims of strict liability, breach of express and implied warranties, negligence, and misrepresentation. App. at 17a. Joy claimed specific damages for lost commercial heat treating, down-time, overtime, repair costs, and various other losses allegedly the result of Lindberg's actions. In their pretrial narrative, defendants disputed Joy's recitation of the facts and claimed that the furnaces were properly designed and manufactured, that no express warranties concerning quality of workmanship had been made, and that all implied warranties had been fulfilled.[4] App. at 186a.
 
 
 6
 The case proceeded to trial. During their cross-examination of Steven Baldwin, one of plaintiff's liability witnesses, defendants attempted to ask questions about a proposal form for Lindberg equipment sent by Lindberg to Joy. Joy's counsel objected on the ground that, if defendants were using that line of questioning to establish that there were terms in the contract different from those that plaintiff had "put in,"[5] defendants were advancing a theory which they had not raised in their pretrial narrative. App. at 200a-01a. Defendants claimed that questions about the proposal form were proper because the document contained a disclaimer of all warranties, including any warranties implied by law. App. at 205a.[6] After extended discussion at side bar, app. at 200a-09a, the court held that defendants could not address the subject of the disclaimer "because [they had] not listed it in [their] pretrial statement." App. at 205a. Defendants then requested permission to amend their pretrial statement prior to presentation of their case in chief in order to be able to raise the issue of disclaimer. The court denied the request. App. at 209a.
 
 
 7
 In its presentation of evidence on damages plaintiff recalled Steven Baldwin. He had earlier testified on direct about his familiarity with Joy's heat treating operation, app. 42a-45a, his familiarity with the purchase of two furnaces from Lindberg, app. at 46a, and his familiarity with problems Joy had experienced with the furnaces, app. at 47a, 50a-57a.[7] In the course of plaintiff's questioning, counsel for Joy asked Baldwin for his estimation of the percentage of losses incurred by Joy that were attributable to the hearth failures. Over objection, Baldwin testified that 90% of the general labor expenses,[8] 90% of the labor costs related to downtime,[9] 90% of the labor variance,[10] and all of the overtime costs,[11] were attributable to the hearth problems of the Lindberg furnaces.[12]
 
 
 8
 On cross-examination, defendants' counsel questioned Baldwin about the source of his estimates. He first testified that he received the information needed to complete those calculations "[f]rom the records of Joy Manufacturing and my personal knowledge." App. at 101a. Upon further questioning, however, Baldwin testified that he had only received a summary of the records, app. at 135a, and that he was not sure what records had been used in preparation of that summary, app. at 136a. He further testified that, to his knowledge, Joy did not keep records which specified the reason a furnace was down on a particular date. App. at 140a. The court then asked the witness:
 
 
 9
 THE COURT: Are you saying, Mr. Baldwin, you cannot connect down time to any particular reason?
 
 
 10
 THE WITNESS: That is correct. A particular reason was that this part broke on the furnace or this was wrong--no.
 
 
 11
 [COUNSEL FOR LINDBERG]: Your Honor, I would move that this testimony of down time damages be stricken as being purely speculative and conjectural.
 
 
 12
 THE COURT: I am going to strike that testimony.
 
 
 13
 [COUNSEL FOR JOY]: I don't think that is what he said. I think he said he can't testify from the records. He testified from his personal observations.
 
 
 14
 THE COURT: Mr. Baldwin, do you remember, in your mind, every day and how much down time there was and the reason for it?
 
 
 15
 THE WITNESS: No. That is absurd.
 
 
 16
 THE COURT: He doesn't remember it in his mind, and there is nothing in the records to substantiate it, and I do strike the testimony dealing with down time.
 
 
 17
 App. at 141a. The court went on to strike Baldwin's testimony as to labor variance, overtime, the amount of heat treating required to be subcontracted out by Joy, and the amount of lost commercial heat treating. App. at 142a-43a. The only damage evidence the court allowed Joy to introduce consisted of invoices totaling $7,968.31. The jury awarded that amount to Joy.
 
 DISCUSSION
 
 18
 A. Lindberg's Motion to Amend its Pretrial Narrative
 
 
 19
 Lindberg argues that the trial court abused its discretion by not allowing defendants to amend their pretrial statement during trial. The court held that defendants were precluded from raising the issue of whether all implied warranties had been disclaimed under the proposal sent by Lindberg to Joy. App. at 205a, 209a.[13] The trial court based its ruling on the statement made by Lindberg in its pretrial narrative that Lindberg had never made any express warranties to Joy and that all implied warranties had been fulfilled.[14]
 
 
 20
 Defendants' pretrial narrative was filed with the court in accordance with W.D.Pa.R. 5-II(D)(2). Rule 5-II(D)(5)(d) states:
 
 
 21
 Failure to fully disclose in the pretrial narrative statement or at the pretrial conference, the substance of the evidence proposed to be offered at trial, will result in the exclusion of that evidence at trial unless the parties otherwise agree or the court otherwise orders.
 
 
 22
 The purpose of this rule is to simplify issues, to expedite the disposition of cases, and to avoid unnecessary delays once a trial had begun. See Ely v. Reading Company, 424 F.2d 758, 763-64 (3d Cir.1970).
 
 
 23
 We previously have held that it is within the trial court's discretionary power to allow for amendment of a pretrial narrative, E.C. Ernst, Inc. v. Koppers Co., 626 F.2d 324, 331 (3d Cir.1980), and absent clear abuse of discretion, our interference with the use of that discretion should be minimal. Ely v. Reading Company, 424 F.2d at 763-64. Our decisions identify four principal criteria for making and evaluating that discretionary judgment: (1) the prejudice or surprise in fact to the nonmoving party, (2) the ability of that party to cure the prejudice, (3) the extent to which the waiver of the rule would disrupt the orderly and efficient trial of the case, and (4) bad faith or willfulness on the part of the movant. Berroyer v. Hertz, 672 F.2d 334, 338 (3d Cir.1982); see Meyers v. Pennypack Woods Home Ownership Association, 559 F.2d 894, 904-05 (3d Cir.1977).[15] Applying these factors to the instant case, we are constrained to hold that the trial court abused its discretion in not allowing Lindberg to amend its pretrial narrative.
 
 
 24
 First, it is clear that any prejudice or surprise to Joy was minimal if it existed at all. In its original complaint Joy alleged breaches of both express and implied warranties by the defendants. Complaint p 21. In its allegation of what constituted the contract between the parties, Joy claimed "[d]efendants received and accepted the aforesaid purchase orders and agreed to supply furnaces conforming to that described in the aforesaid purchase orders and as described in their quotations." Complaint p 10 (emphasis added). In its pretrial narrative Joy claimed that in June, 1974, Lindberg submitted to Joy a proposal containing "numerous express warranties." App. at 18a. Joy indicated that at trial it would "establish that Lindberg breached expressed warranties as to the quality and workmanship and capacity of the furnaces as set forth in written proposals made to Joy...." App. at 24a. Although Lindberg claimed in its pretrial narrative to have made no express warranties and to have fulfilled all implied warranties, app. at 189a, the parties jointly filed a later pretrial stipulation which stated that "[t]his is an action for ... breach of express and implied warranties...." Pretrial Stipulation at 1. Joy specifically identified as Plaintiff's Exhibit Number 38 the proposal form that Lindberg later tried to use in questioning Baldwin. Pretrial Stipulation at 7.[16] These facts show that plaintiff was not only aware of the document which contained the alleged waiver, but had originally relied on it as a basis for its claims of liability. Despite defendants' statement in their pretrial narrative, plaintiff continued throughout the pretrial process to claim breach of both implied warranty and express warranty, specifically, the breach of the express warranty made in Lindberg's proposal form.[17] Plaintiff could hardly claim surprise over the existence of the proposal form or the disclaimer which Lindberg contended it contained.
 
 
 25
 Second, plaintiff could have minimized any prejudice caused by allowing Lindberg to amend its pretrial narrative. Defendants sought leave to amend "prior to presentation of [their] case in chief." App. at 209a. This motion was made on August 12, 1981, the first full day of trial. It was not until August 20 that defendants began presentation of their case. Transcript of August 20 at 113. There is no indication that Joy could not have sought a continuance to prepare a response to Lindberg's claim of waiver.[18] If defendant's motion presented any possible prejudice, plaintiff would have been able to cure it. See Meyers v. Pennypack Woods, 559 F.2d at 905.
 
 
 26
 Third, allowing defendant to amend would not have disrupted the orderly and efficient trial of the case. Defendants' amendment really went to the terms of the contract between the parties, an issue both parties agreed was in dispute. Transcript of August 12 at 31-32. The determination of whether implied warranties existed at all is clearly relevant to the issue of breach of those warranties. It would not have disrupted the trial process to allow the defendants to argue that all implied warranties had been waived.[19]
 
 
 27
 Fourth, there is no evidence of bad faith on the part of the defendants. Claims based on breach of the express warranty allegedly contained in Lindberg's proposal form had been made by plaintiff a year earlier. It was that same warranty which Lindberg relied on when raising the issue of disclaimer. There is nothing to indicate that the defendants purposefully or wilfully withheld their disclaimer argument until trial in order to prejudice the plaintiff.
 
 
 28
 Thus we hold it was an abuse of discretion for the trial judge not to allow Lindberg to amend its pretrial narrative to include the issue of disclaimer of implied warranties.
 
 B. Baldwin's Damage Testimony
 
 29
 In its appeal Joy argues that the district court erred by excluding Baldwin's testimony concerning the percentage of Joy's losses attributable to hearth problems. The court concluded that Baldwin's lack of personal knowledge made his non-expert opinion about percentages "mere speculation" and "unbelievable." App. at 147a.[20] The court, therefore, held his testimony inadmissible.[21]
 
 
 30
 In diversity cases, the admissibility of nonexpert opinion testimony is governed by the Federal Rules of Evidence. See Pollard v. Metropolitan Life Insurance Co., 598 F.2d 1284, 1286 (3d Cir.), cert. denied, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 171 (1979); Fed.R.Evid. 101.[22] Under the federal rules, opinion testimony by a lay witness is admissible if his opinion or inferences are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue. Fed.R.Evid. 701; Teen-Ed, Inc. v. Kimball International, Inc., 620 F.2d 399, 403 (3d Cir.1980). That rule reflects the modern trend to allow the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination. Teen-Ed, 620 F.2d at 403; 11 J. Moore, supra, Sec. 701.02; 3 J. Weinstein & M. Berger, Weinstein's Evidence p 701 (1981). In the instant case, Lindberg does not argue that Baldwin's estimates would not be helpful in understanding his other testimony or determining a fact in issue. See Teen-Ed, 620 F.2d at 403-04. Thus the admissibility of Baldwin's testimony under Rule 701 must rest on whether it was rationally based on his perceptions as plant supervisor for Joy.
 
 
 31
 The requirement of Rule 701 that lay opinion be rationally based on the perception of the witness reflects the general limitation embodied in Federal Rule of Evidence 602 that in order to testify on a subject a witness must have "personal knowledge of the matter." Teen-Ed, 620 F.2d at 403; 11 J. Moore, supra, Sec. 701.10; 3 J. Weinstein & M. Berger, supra, p 701.[23] We have previously stated:
 
 
 32
 We recognize initially the primary rule of evidence that a witness ought to state only those facts of which he has personal knowledge. 'The law requires that he who deposes to a fact should have the means of knowing it.' State v. Allen, 1 Hawks 9 (1820).... [W]hat the witness represents as his knowledge must be an impression derived from his own senses. And this impression must be gauged by the geographic proximity of the witness to the event, the length of time involved, and the existence of proper conditions for the exercise of powers of observation and perception.
 
 
 33
 United States v. Barber, 442 F.2d 517, 526 (3d Cir.), cert. denied, 404 U.S. 846, 92 S.Ct. 148, 30 L.Ed.2d 83, 404 U.S. 958, 92 S.Ct. 327, 30 L.Ed.2d 275 (1971). That same analysis must be applied when deciding whether a witness's opinion is rationally based on his perception for the purpose of Fed.R.Evid. 701. The court is in essence requiring that the best evidence available--first-hand knowledge versus second-hand knowledge--be presented to the jury for use in its deliberation. 3 J. Weinstein & M. Berger, supra, p 602.
 
 
 34
 We recognize that a trial court's determination of admissibility may be overturned only for clear abuse of discretion, Pollard v. Metropolitan Life Insurance Co., 598 F.2d 1284, 1286 (3d Cir.), cert. denied, 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 171 (1979); see Hill v. Nelson, 676 F.2d 1371, 1373 (11th Cir.1981). We reluctantly hold, however, that the trial court clearly abused its discretion in striking Baldwin's testimony insofar as he, based on his personal knowledge, testified to the percentage of downtime due to hearth problems. The record reveals that Baldwin, in his position as Supervisor of Production Control, had extensive personal knowledge of Joy's plants, its on-going heat treating processes, and the two furnaces in question. Baldwin testified in great detail to the work done by Joy at its Reno plant. App. at 42a-46a. He testified that he was directly involved with the negotiations for the furnaces, app. at 46a; Transcript of August 12 at 36-39, with the purchase and installation of the furnaces, app. at 46a; Transcript of August 12 at 39-44, and with the operation of the furnaces on a day-to-day basis, app. at 46a, 47a, 48a, 75a. He testified that as supervisor he attended production meetings where problems with capacity at any work center, including the two furnaces, were discussed. App. at 47a.[24] He specifically testified about the hearth problems, app. at 50a, 52a-55a, 59a-60a, and about his observations of what was happening in heat treating on a day-to-day basis, app. at 46a, 75a.
 
 
 35
 This undisputed testimony indicates Baldwin had sufficient personal knowledge of Joy's heat treating facility to make an estimate of what amount of downtime was due to the hearth problems. His opinion was rationally based on his knowledge, as a personal observer, of Joy's furnace operation. His inability to state precisely why a furnace was inoperable at a particular time was the proper material for effective cross-examination rather than a basis to hold his testimony completely inadmissible.[25] See United States v. Jackson, 688 F.2d 1121 at 1125 (7th Cir.1982). As long as a witness' opinion is rationally based on his perception, that testimony is not barred by Fed.R.Evid. 701.
 
 C. Conclusion
 
 36
 Because we conclude the district court erred in not allowing Lindberg to amend its pretrial narrative and in striking Baldwin's testimony on damages, we will vacate the district court's judgment and remand for a new trial on both liability and damages.[26]
 
 
 
 [1]
 By stipulation General Signal Corporation was dismissed as a party prior to trial. App. at 16a
 
 
 [2]
 Defendants will hereinafter be referred to collectively as "Lindberg."
 
 
 [3]
 The major problem alleged by Joy was "partial or total collapse of [the furnaces'] ceramic skid tile hearth." Brief of Appellant-Appellee Joy Manufacturing Company at 3. In addition, Joy claimed a variety of mechanical difficulties with the furnaces' operation
 
 
 [4]
 Defendants also argued that many of Joy's claims were barred by applicable statutes of limitations
 
 
 [5]
 Plaintiff had previously introduced purchase orders which it alleged constituted the terms and conditions of the contract between Joy and Lindberg. Transcript of August 12 at 40-41, 45
 
 
 [6]
 Paragraph 12 of the "Proposal Terms and Conditions" in the proposal form stated:
 WARRANTIES. Lindberg warrants equipment and parts manufactured by it and supplied hereunder to be free from defects in materials and workmanship for a period of ninety (90) days after shipment (or installation, if by Lindberg). If within such period any such equipment or parts shall be proved to Lindberg's satisfaction to be defective, such equipment or parts shall be repaired or replaced, for installation at purchaser's expense, at Lindberg's option. Lindberg's obligation hereunder shall be limited to such repair and replacement, f.o.b. its factory, and shall be conditioned upon Lindberg receiving written notice of any alleged defect within ten (10) days after its discovery and at Lindberg's option, return of such equipment or parts prepaid to its factory. This warranty shall not apply to equipment or parts not manufactured by Lindberg or to equipment or parts which shall have been repaired or altered by others than Lindberg so as in its judgment, adversely to affect the same or which shall be subject to negligence, accident, damage or circumstances beyond Lindberg's control, or improper operation, maintenance or storage, or to other than normal use or service or to parts whose normal span of life might be shorter than the overall warranty period. With respect to equipment and parts not manufactured by Lindberg, the warranty obligations of Lindberg shall in all respects conform and be limited to the warranty extended to Lindberg by the supplier.
 Lindberg further warrants that all services performed for the purchaser hereunder will be performed in a good and workmanlike manner. Lindberg's obligation and liability with respect to such warranty shall be limited to the amount received by it from the purchaser on account of such services.
 THE FOREGOING WARRANTIES ARE IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES (EXCEPT TITLE) INCLUDING WITHOUT LIMITATION WARRANTIES OF MERCHANTABILITY AND FITNESS FOR PURPOSE. Lindberg shall not be subject to any other obligations or liabilities whatsoever with respect to equipment, parts or services manufactured or furnished by it; or any undertakings, acts of omissions relating thereto; provided, that Lindberg may be liable for any damages (except damage to machinery or parts furnished by Lindberg or consequential or contingent damages of any nature) directly attributable to negligence of any of its officers or employees.
 Defendants' Exhibit A.
 
 
 [7]
 During Baldwin's testimony, he was shown Plaintiff's Exhibit No. 86, a memo written by Baldwin to his superior, Les Rollins, which allegedly set out the problems Joy was having with the furnaces at that time. App. at 48a. Lindberg's counsel objected to the utilization of the exhibit, arguing "[t]his witness testified he had knowledge of what those problems were. I don't see any need for the memo." App. at 49a. The court sustained the objection
 
 
 [8]
 App. at 79a, 80a. General labor expenses are the labor costs of Lindberg's maintenance men in the plant. App. at 78a-79a
 
 
 [9]
 App. at 95a. Labor costs related to downtime are the wages paid to a production worker during the first 120 hours a furnace is down. App. at 84a
 
 
 [10]
 App. at 98a. Labor variance is the wages paid to a production worker during the time a furnace is down beyond the first 120 hours. App. at 95a-96a
 
 
 [11]
 App. at 99a. Overtime expenses are labor costs resulting from work done on Saturday and Sunday. App. at 98a
 
 
 [12]
 Baldwin also testified that Joy lost profits from commercial heat treating work it intended to perform, app. at 83a, and that Joy's plant no longer had the capacity to perform Joy's own heat treating needs, app. at 77a, 82a
 
 
 [13]
 The court allowed some parts of the proposal form to be used in questioning the witness but excluded any part of the document that went to the issue of disclaimer. App. at 206a-08a
 
 
 [14]
 Lindberg's pretrial narrative said "[a]t no time did Lindberg make any express warranties concerning the quality or workmanship of these furnaces nor was Lindberg informed by Joy of its intended usage or purposes of the furnaces. All implied warranties had been fulfilled and these furnaces continue to operate at Joy and other facilities." App. at 189a
 
 
 [15]
 Both Berroyer and Meyers involved review of a lower court's decision on whether a witness not identified in a pretrial stipulation or order could be called to testify
 
 
 [16]
 On direct, Baldwin testified to having received a quotation from Lindberg although he did not identify it as the proposal form Lindberg attempted to use in its questioning. Transcript of August 12, 1981 at 39-40
 
 
 [17]
 The record reveals that plaintiff's theories shifted between the pretrial and the trial stage
 
 
 [18]
 The record discloses that because of personal problems related to an individual involved in the case, the court adjourned on August 12 and did not reconvene until August 17. Transcript of August 12 at 74; Memorandum of Trial. That action by the court reflects the trial judge's obvious desire and ability to accommodate the needs of the parties when necessary
 
 
 [19]
 The record reveals that both sides changed their legal theories in preparation for trial. Given the uncertainty created by these shifting legal arguments, see e.g., Transcript of August 12 at 30-33; app. at 200a-06a, introduction of evidence of a disclaimer would not be disruptive
 
 
 [20]
 Baldwin based his testimony on both personal knowledge and summaries of Joy's records which he received from Joy's accountant. App. at 101a, 136a. The court struck his testimony both because "[h]e doesn't remember it in his mind, and there is nothing in the records to substantiate it." App. at 142a. In its appeal, Joy argues only that Baldwin had sufficient personal knowledge to make an estimate and does not claim that Baldwin should have been allowed to testify from the records
 
 
 [21]
 The parties appear to have been confused about why the trial court held Baldwin's testimony inadmissible. In response to the trial court's ruling, counsel submitted cases to the trial judge discussing the issue of what type of evidence was necessary and proper to prove damages under Illinois law. See app. at 148a. Joy argued that once the existence of damages has been shown, opinion testimony could be utilized to prove the amount of damages. The court disagreed, stating that Joy's proof lacked the "reasonable certainty" required by state law
 We make no ruling, however, concerning the type of evidence necessary to prove damages under Illinois law. The record reveals that the court's decision striking Baldwin's testimony was based on its conclusion that Baldwin lacked sufficient personal knowledge to make his estimates, not that the estimates were irrelevant under Fed.R.Evid. 401, see Greiner v. Volkswagenwerk Aktiengeselleschaft, 540 F.2d 85, 88-89 (3d Cir.1976). App. at 141a-42a, 145a-47a. It is that ruling which we must review.
 
 
 [22]
 Fed.R.Evid. 101 provides: "These rules govern proceedings in the courts of the United States." While the rules do indicate a desire by Congress to defer to state law in diversity cases on matters such as presumptions, Fed.R.Evid. 302, privileges, Fed.R.Evid. 501, and competency, Fed.R.Evid. 601, no similar restriction is placed on lay opinion testimony. Cf. Pollard, 598 F.2d at 1286 (Federal Rules govern the admissibility of documentary evidence). Application of the federal rules also would not encourage forum shopping or the inequitable administration of the law and thus does not run afoul of policies inherent in Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1928), and its progeny. See Hanna v. Plumer, 380 U.S. 460, 466-68, 85 S.Ct. 1136, 1141-42, 14 L.Ed.2d 8 (1965); Jarvis v. Johnson, 668 F.2d 740, 742-44 (3d Cir.1982). See generally 10 J. Moore, Moore's Federal Practice Sec. 5[4.-1] (2d ed. 1981); 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2405 (1971 & Supp.1981); Ely, The Irrepressible Myth of Erie, 87 Harv.L.Rev. 693 (1973)
 
 
 [23]
 The personal knowledge rule is not an issue of competency but "is in fact a specialized application of the provisions of Rule 104(b) on conditional relevancy." Fed.R.Evid. 602 advisory committee note. Compare 10 J. Moore, supra, Sec. 601.02 with J. McCormick, McCormick's Handbook of the Law of Evidence Sec. 69 (1972)
 
 
 [24]
 Baldwin testified to a December 2, 1976 meeting where Joy's problems with the Lindberg furnaces were specifically discussed. App. at 48a
 
 
 [25]
 As the Advisory Notes to subpart (b) of Rule 701 state:
 The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction than the broad assertion, and a lawyer can be expected to display his witness to the best advantage. If he fails to do so, cross-examination and argument will point up the weakness.
 Fed.R.Evid. 701 advisory committee notes.
 
 
 [26]
 Lindberg also asks this court to hold that the trial court erred in charging the jury on negligent misrepresentation. Lindberg, however, did not object below to the jury instructions, see Lindberg's Request for Charge (filed August 21, 1981); Transcript of August 24 at 636-40, and therefore is unable to raise that issue on appeal. Fed.R.Civ.P. 51. We therefore do not reach that issue and leave to the district court at a new trial the decision whether such an instruction is proper in light of the Illinois Supreme Court's decision in Moorman Manufacturing Co. v. National Tank Co., 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982)