

1995 Decisions

6-20-1995

# Asplundh Mfg v Benton Harbor

Precedential or Non-Precedential:

Docket 94-1095

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

## Recommended Citation

"Asplundh Mfg v Benton Harbor" (1995). *1995 Decisions.* Paper 170.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/170

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 94-1095 and 94-1201
_____


ASPLUNDH MANUFACTURING DIVISION,
a Division of Asplundh Tree Expert Co.;
NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA.

Asplundh Manufacturing Division and
National Union Fire Insurance Company
of Pittsburgh, PA
Appellants in No. 94-1201

v.

BENTON HARBOR ENGINEERING,

Benton Harbor Engineering
Appellant in No. 94-1095

_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. Civ. No. 89-cv-00252)
_____


Argued: August 12, 1994

Before:  BECKER, ALITO, Circuit Judges, and
GIBSON, Senior Circuit Judge[*]


(Filed  June 20, l995 )



BASIL A. DiSIPIO, ESQUIRE (ARGUED)
THOMAS FINARELLI, ESQUIRE
Lavin, Coleman, Finarelli & Gray
Penn Mutual Tower, 12th Floor

_____

[*].  Honorable John R. Gibson, Senior United States Circuit Judge
for the Eighth Circuit Court of Appeals, sitting by designation.

500 Walnut Street
Philadelphia, PA  19106

Attorneys for Asplundh Manufacturing
Division, a Division of Asplundh Tree
Expert Co. and National Union Fire
Insurance Co. of Pittsburgh


JOHN M. CORCORAN, ESQUIRE (ARGUED)
ROBERT G. KELLY, JR., ESQUIRE
Kelly, McLaughlin & Foster
1700 Atlantic Building
260 South Broad Street
Philadelphia, PA  19102

Attorneys for Benton Harbor Engineering

---

OPINION OF THE COURT

---

BECKER, Circuit Judge.

The defendant, Benton Harbor Engineering ("Benton Harbor"), appeals from an order of the district court denying its motion for a new trial, and also from a judgment against it on a contribution claim brought by Asplundh Tree Expert Co. ("Asplundh") and by National Union Fire Insurance Company of Pittsburgh ("National Union"), Asplundh's liability insurance carrier.  Asplundh and National Union sought to recover some or all of their costs in settling a wrongful death suit brought against Asplundh by the estate of Jeffrey Sackerson, who was killed when an Asplundh aerial lift in which he was working fractured (Benton Harbor having manufactured the component part of the aerial lift which allegedly failed).  Benton Harbor's principal argument on appeal is that the district court erred in

permitting Asplundh to adduce lay opinion testimony pursuant to Federal Rule of Evidence 701 regarding what appear to be complex technical issues concerning the cause of the metal failure.

Rule 701, which contemplates admission of lay opinions rationally based on personal knowledge so as to be helpful to the trier of fact, was primarily designed to allow lay individuals to express opinions that are in reality only a shorthand statement of fact. However, this court, like other courts, has commonly interpreted the rule to permit individuals not qualified as experts, but possessing experience or specialized knowledge about particular things, to testify about technical matters that might have been thought to lie within the exclusive province of experts. This flexible, arguably expansive, interpretation of Rule 701 appears to be consistent with its text. Where, however, a party proffers a witness expressing an opinion on matters such as the design of hydraulic cylinders or the cause of metal failure, the trial court must be rigorous in assuring that the lay witness satisfies the strictures of Rule 701. In particular, the proponent of technical lay opinion testimony must show that the testimony is based on sufficient experience or specialized knowledge and also show a sufficient connection between such knowledge or experience and the lay opinion such that it may be fairly considered to be "rationally based on the perception of the witness" and truly "helpful" to the jury.

Given the standard we articulate today for the admission of lay opinion evidence of a technical nature, we conclude that the district court's ruling was based on an

impermissible interpretation of Rule 701; that is, because the court failed to examine with sufficient rigor whether the testimony in question was informed by sufficient experience or specialized knowledge.  More particularly, in order to satisfy the rationally derived and helpfulness standards of Rule 701, Asplundh needed to demonstrate that the witness possessed sufficient experience or specialized knowledge which qualified him to offer a technical opinion regarding the cause of metal failure and the design of hydraulic cylinders.  While a lay witness could acquire this additional insight either by formal education or practical experience, it appears the witness at issue simply possessed neither.  Because the admission of the testimony was not harmless, we will reverse the judgment of the district court and remand for further proceedings.

Although Asplundh and National Union cross appeal, arguing that the district court erred in failing to award prejudgment interest, we do not, in view of our result, reach this question.

## I.  Facts and Procedural History

Jeffrey Sackerson was killed while operating an aerial lift, manufactured by Asplundh, which was mounted onto a truck chassis and used in tree trimming operations.  At the time, Sackerson was employed by the city of Portland, Oregon, which owned, operated and maintained the aerial lift.  When Sackerson's estate filed a wrongful death suit against Asplundh, Asplundh and its insurer, National Union, brought a third-party action seeking

contribution and indemnity from Benton Harbor, the manufacturer of the lower boom cylinder containing the piston rod which allegedly fractured and caused the accident. The jury returned a verdict for Asplundh and National Union, finding Asplundh eighty percent responsible and Benton Harbor twenty percent responsible. The district court entered judgment for Asplundh and National Union in the amount of $185,881.60, twenty percent of the Sackerson settlement. Post-trial motions were filed by both parties. Asplundh and National Union sought prejudgment interest, and Benton Harbor sought a new trial based on alleged error in admitting the lay opinion testimony of Michael Jones. Both motions were denied by the district court. These appeals followed.

Jones, the witness whose testimony is at issue, had been fleet maintenance supervisor for the City of Portland for more than ten years at the time of the accident. Jones's responsibilities covered all city equipment, including the Asplundh aerial lift. He supervised between sixty and one hundred employees, six or seven city repair shops, and the maintenance of 1385 pieces of equipment.

After the accident, Jones and his employees took apart and inspected the aerial lift's boom assembly in the City of Portland's shop. During this inspection, Jones observed the rod from a distance of about fifteen inches. In his deposition, Jones stated his opinion that a component of the lower boom assembly -- the rod end -- had fractured. The rod end was a threaded metal rod that was screwed into a threaded metal casing

called the rod cylinder. A hole was drilled through both the casing and the rod end, and a metal pin was inserted through the hole. See App. at 315.

Jones expressed the opinion that the fracture was caused by metal fatigue and was attributable to the design of the rod end. Id. at 161, 167. Specifically, he stated that there was a "problem" because Benton Harbor's design called for a hole to be drilled through the rod end at a point where it was threaded. Id. Moreover, Jones noted that the cylinder rod had oxidized around a portion of the break which was a different, duller color than the rod's fresh break. From this, Jones concluded that the break occurred in stages. Jones also related that the break was in a threaded area where a hole had been drilled through the rod. Jones concluded that the rod fatigued inside the rod eye, causing the accident, stating that the stop block on the lower boom cylinder rods did not contribute to the accident.[1]

In particular, Jones attributed the accident "to the way the rod was drilled through, and the fact that the rod eye

---

[1]. Jones stated:

> Well, it seems like -- seemed to me that all the bulletins that came out after the fact, after Sackerson's death, were dealing with the stop blocks as if the stop blocks somehow would have saved his life. And there's no way I happen to believe that. Stop blocks didn't have a damn thing in the world to do with Sackerson's death.

App. at 166.

was screwed on on a threaded -- two threaded surfaces." App. at 167; App. at 160-61 ("The reasons [for the accident] are two: one, the hole through the pin caused . . . the rod to be weakened and, two, the threads . . . on the rod itself caused the breaking point. They were sharp, and it broke right at the point where all of those things intersected. That was the problem. There's no doubt in my mind about it. . . ."). He questioned the appropriateness of this rod end design, stating that before his examination he "had no idea that this thing was threaded on and then drilled and pinned, up to that point," since he "had never seen a cylinder that size configured that way." Id. Jones reiterated that he "never saw other cylinders configured that way," and that he "kn[e]w how other cylinders were configured differently," since he was a production control manager for a company that produced hydraulic cylinders. Id. Moreover, Jones asserted expertise in this area, declaring, "I think I know how to make hydraulic cylinders." Id.

Key portions of Jones's deposition were read to the jury over Benton Harbor's objection. The district court overruled the objections to the reading of the deposition testimony, allowing Jones to testify as a lay witness expressing an opinion under Rule 701. FED. R. EVID. 701. Benton Harbor argues that Jones's technical deposition testimony is not the type of lay opinion evidence properly admissible under Rule 701.

Our review is plenary, since the district court's ruling turns on an interpretation of Rule 701, which would permit the admission of technical lay opinion evidence in this case. A

determination regarding the scope of evidence properly admitted

under a Federal Rule of Evidence is a question of law subject to

plenary review.  See DeLuca v. Merrell Dow Pharm. 911 F.2d 941,

945 (3d Cir. 1990); U.S. v. Furst, 886 F.2d 558, 571 (3d Cir.

1989) ("To the extent that the district court's admission of

[evidence] was based on an interpretation of the Federal Rules of

Evidence, we exercise plenary review.").


## II.  The Rule 701 Jurisprudence

### A.

In determining whether Jones's opinion testimony was

properly admitted by the district court, we must determine the

scope of Federal Rule of Evidence 701, which provides:

> If the witness is not testifying as an
> expert, the witness' testimony in the form of
> opinions or inferences is limited to those
> opinions or inferences which are (a)
> rationally based on the perception of the
> witness and (b) helpful to a clear
> understanding of the witness' testimony or
> the determination of a fact in issue.

FED. R. EVID. 701.

Rule 701 represents a movement away from the courts'

historically skeptical view of lay opinion evidence.  At common

law, witnesses not qualifying as experts were not permitted to

draw conclusions which could be characterized as opinion

testimony, but rather were required to limit their testimony to

facts, those things "they had seen, heard, felt, smelled, tasted,

or done."  Hon. Charles R. Richey, Proposals To Eliminate the

Prejudicial Effect of the Use of the Word "Expert" Under the

<u>Federal Rules [of] Evidence in Civil and Criminal Jury Trials</u>, 154 F.R.D. 537, 542 (1994) ("Mere opinions were considered unreliable bases for testimony.").

This rigid distinction between fact and opinion led to numerous appeals and pervasive criticism by commentators. <u>See generally</u> 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 701[01] (1994). Wigmore declared, in the first edition of his treatise, that this distinction "has done more than any one rule of procedure to reduce our litigation towards a sense of legalized gambling." 3 John H. Wigmore, Evidence § 1929 at 2563 (1st ed. 1904); <u>see also</u> Willard L. King & Douglas Pillinger, Opinion Evidence in Illinois 8 (1942) ("The American courts have had a great struggle with a rule which appeared to require them to admit statements of fact and exclude all inferences of the witness. Such a rule is quite impossible of application: all statements contain inferences."); James B. Thayer, A Preliminary Treatise on Evidence at the Common Law 524 (1898) ("In a sense all testimony to matter of fact is opinion evidence, i.e. it is a conclusion formed from phenomena and mental impressions.").

Characteristically, however, the most eloquent criticism of this common-law restriction on lay testimony was made by Judge Learned Hand:

> Every judge of experience in the trial of causes has again and again seen the whole story garbled, because of insistence upon a form with which the witness cannot comply, since, like most men, he is unaware of the extent to which inference enters into his perceptions. He is telling the "facts" in the only way that he knows how, and the result of nagging and checking him is often

> to choke him altogether, which is, indeed, usually its purpose.

Central R.R. Co. v. Monahan, 11 F.2d 212, 214 (2d Cir. 1926).

Judge Hand also stated:

> The truth is, as Mr. Wigmore has observed at length that the exclusion of opinion evidence has been carried beyond reason in this country, and that it would be a large advance if courts were to admit it with freedom. The line between opinion and fact is at best only one of degree, and ought to depend solely upon practical considerations, as, for example, the saving of time and the mentality of the witness.

Id. (citations omitted).

These concerns about the restrictions on lay opinion testimony, combined with a more general liberalization in those rules of evidence that operated to deprive the fact-finder of relevant evidence,[2] led to the adoption of Rule 701. The Advisory Committee Note to the rule reflects the fact that Rule 701's liberalization of the admissibility of opinion evidence is rooted in the modern trend away from fine distinctions between fact and opinion and toward greater admissibility, tempered with an understanding that the adversary process, and more specifically, cross-examination will correct any problems:

---

[2]. The admissibility of expert opinion testimony was also more limited at common law and liberalized under the Federal Rules. Among other requirements, expert testimony was limited to those areas that were "not within the common knowledge of the average layman." Bridger v. Union Railway Co., 355 F.2d 382, 387 (6th Cir. 1966). With the enactment of the Federal Rules of Evidence the common law restrictions on expert testimony have been liberalized and the permissible content has been broadened.

The rule retains the traditional objective of putting the trier of fact in possession of an accurate reproduction of the event.

Limitation (a) is the familiar requirement of first-hand knowledge or observation.

Limitation (b) is phrased in terms of requiring testimony to be helpful in resolving issues. Witnesses often find difficulty in expressing themselves in language which is not that of an opinion or conclusion. While the courts have made concessions in certain recurring situations, necessity as a standard for permitting opinions and conclusions has proved too elusive and too unadaptable to particular situations for purposes of satisfactory judicial administration. Moreover, the practical impossibility of determining by rule what is a "fact," demonstrated by a century of litigation of the question of what is a fact for purposes of pleading under the Field Code, extends into evidence also. The rule assumes that the natural characteristics of the adversary system will generally lead to an acceptable result, since the detailed account carries more conviction that the broad assertion, and a lawyer can be expected to display his witness to the best advantage. If he fails to do so, cross-examination and argument will point up the weakness. If, despite these considerations, attempts are made to introduce meaningless assertions which amount to little more than choosing up sides, exclusion for lack of helpfulness is called for by the rule.

FED. R. EVID. 701 advisory committee's note (citations omitted).

The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance and an endless number of items that cannot

be described factually in words apart from inferences.  See Mason
Ladd, Expert Testimony, 5 VAND. L. REV. 414, 417 (1952).  The more
liberal approach to lay opinion testimony of this type gained
acceptance as a rule of "convenience," which allowed for
"`shorthand renditions' of a total situation, or [for] statements
of collective facts."  1 McCORMICK ON EVIDENCE 44 & n.16 (4th ed.
1992); see also Mark McCormick, Opinion Evidence in Iowa, 19
DRAKE L. REV. 245, 248 (1970) (viewing this rule as allowing for a
"shorthand rendering of the facts").

As recognized by Professor Saltzburg, testimony that a
person was "excited" or "angry" is more evocative and
understandable than a long physical description of the person's
outward manifestations.  STEPHEN A. SALTZBURG ET. AL., FEDERAL RULES OF
EVIDENCE MANUAL 1032 (6th ed. 1994).  For example, a witness who
testifies that an individual whom he saw staggering or lurching
along the way was drunk is spared the difficulty of describing,
with the precision of an orthopedist or choreographer, the
person's gait, angle of walk, etc.  See, e.g., United States v.
Mastberg, 503 F.2d 465 (9th Cir. 1974) (permitting under Rule 701
the testimony of a customs inspector that the defendant appeared
nervous); State v. Hall, 353 N.W.2d 37, 43 (S.D. 1984)
(permitting police officers to give lay opinion concerning
defendant's intoxicated state)[3]; Kerry Coal Co. v. United Mine

_____

[3].  All state cases cited herein are decided under state rules of
evidence identical or analogous to Rule 701 of the Federal Rules.
As of this entry, some 28 states have adopted Federal Rule 701
without change.  See WEINSTEIN, supra, ¶ 701[03].

Workers, 637 F.2d 957, 967 (3d Cir.) (allowing the admission of testimony that plaintiff's employees were "nervous and afraid" as a shorthand report of witnesses' observations of employee reactions), cert. denied, 454 U.S. 823 (1981).

Perhaps the best judicial description of this type of testimony under Rule 701 is found in United States v. Yazzie, 976 F.2d 1252 (9th Cir. 1992). Yazzie was charged with statutory rape under a federal statute that permitted a defense of reasonable mistake as to the age of the minor. At trial, Yazzie asserted that he reasonably believed that the minor, age fifteen-and-a-half, was over the statutory age of sixteen. In support of this contention, Yazzie called several witnesses who offered to testify that, as of the date of the incident, their observations caused them to believe the minor to be between the age of sixteen and twenty. The trial court excluded this testimony as impermissible lay "opinion" and limited the witnesses' testimony to "facts," such as that the minor smoked cigarettes, wore make-up, and drove a car. The Court of Appeals reversed, stating:

> We understand Rule 701 to mean that opinions of non-experts may be admitted where the facts could not otherwise be adequately presented or described to the jury in such a way as to enable the jury to form an opinion or reach an intelligent conclusion. If it is impossible or difficult to reproduce the data observed by the witnesses, or the facts are difficult of explanation, or complex, or are of a combination of circumstances and appearances which cannot be adequately described and presented with the force and clearness as they appeared to the witness, the witness may state his impressions and opinions based upon what he observed. It is

> a means of conveying to the jury what the witness has seen or heard.

*Id.* at 1255 (quoting United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982) (internal quotation marks omitted)). The court concluded that the testimony of the witnesses satisfied Rule 701's requirements:

> Here, the opinion testimony not only meets the requirements of sub-part (a) of Rule 701, but of both the alternative sub-parts of (b). The testimony helps in the understanding of the witnesses' descriptive testimony and in determining a critical fact at issue -- whether it was reasonable for Yazzie to believe that the minor was sixteen or older.
>
> In the case before us, the jurors could not themselves assess how old the minor looked at the time of the incident: by the time of the trial, the minor was almost seventeen years old, and her appearance was undoubtedly substantially different than it had been on the night in question, a year and a half earlier. Thus, the jurors were wholly dependent on the testimony of witnesses. Yet the witnesses were permitted to testify only to the minor's describable features and behavior. Their testimony was no substitute for a clear and unequivocal statement of their opinions. It did not tell the jury that these witnesses believed the minor to be at least sixteen years old at the time of the incident.

*Id.* (footnote omitted).

Other examples of this type of quintessential Rule 701 opinion testimony include identification of an individual,[4] the

---

[4]. United States v. Langford, 802 F.2d 1176, 1178-79 (9th Cir. 1986) (admitting identification testimony with respect to persons depicted in a bank surveillance photograph), cert. denied, 483 U.S. 1008 (1987); United States v. Allen, 787 F.2d 933, 935-37 (4th Cir. 1986) (same), cert. denied, 488 U.S. 944 (1988); United States v. Farnsworth, 729 F.2d 1158, 1160-61 (8th Cir. 1984)

speed of a vehicle,[5] the mental state or responsibility of

another,[6] whether another was healthy,[7] the value of one's

property,[8] and other situations in which the differences between

(..continued)
(same); United States v. Jackson, 688 F.2d 1121, 1125 (7th Cir. 1982) (same), cert. denied, 460 U.S. 1043 (1983).

[5]. United States v. Carlock, 806 F.2d 535, 552 (5th Cir. 1986) (recognizing that a "common illustration" of an admissible opinion under Rule 701 is "an expression of opinion by a lay observer of a car's speed"), cert. denied, 480 U.S. 949 (1987); see also Ernst v. Ace Motor Sales, Inc., 550 F. Supp. 1220, 1222– 23 (E.D. Pa. 1982) (admitting opinion testimony as to the point of impact of two vehicles from a police officer who did not observe a car accident, but arrived shortly thereafter), aff'd, 720 F.2d 661 (3d Cir. 1983).

[6]. United States v. Lawson, 653 F.2d 299, 303 (7th Cir. 1981), cert. denied, 454 U.S. 1150 (1982) (concluding that lay opinion testimony by FBI agents as to defendant's sanity was properly admitted despite fact that the agents had little opportunity to view the defendant); Lewisohn v. State, 433 A.2d 351, 355 (Me. 1981) (concluding, in habeas corpus proceedings, that testimony by witness that a certain juror, prior to having been selected for jury, had preconceived notions that petitioner was guilty was an inference rationally based on the witness' perception and helpful in determining a fact in issue, and therefore properly admitted).

[7]. Singletary v. Secretary of HEW, 623 F.2d 217, 219 (2d Cir. 1980) (permitting, in a reversal of a denial of disability benefits, the lay opinion of a claimant's son that his father was an alcoholic and unable to work); State v. Jennings, 430 S.E.2d 188, 201 (N.C. 1993) (recognizing "the state of a person's health" as "a proper subject[] for lay opinion").

[8]. See United States v. Ranney, 719 F.2d 1183, 1189 & n.11 (1st Cir. 1983) (permitting defrauded investors to testify as to the value of their investment); Neff v. Kehoe, 708 F.2d 639, 643–44 (11th Cir. 1983) (reversing, in an action alleging misrepresentations in sale of a coin collection, the exclusion of testimony of the plaintiff/buyer, who was determined competent to give lay opinion testimony as to the value of the coins, even though such testimony was self–serving and unsupported by other evidence); Garris v. Massey, 606 S.W.2d 109, 112 (Ark. Ct. App. 1980) (allowing owner of similar property to testify as to value of property in issue).

fact and opinion blur and it is difficult or cumbersome for the examiner to elicit an answer from the witness that will not be expressed in the form of an opinion.[9] See generally SALTZBURG, supra, 1031-36; WEINSTEIN, supra, ¶ 701[02]. These cases, it is important to add, all meet the core definitional terms of Rule 701 -- the opinion is based upon personal knowledge, as rationally based thereon, and is helpful to the trier of fact.

B.

While many, if not most, of the cases decided under Rule 701 are of the genre just described, the jurisprudence has expanded beyond this core area to permit lay persons to express opinions that are not shorthand statements of fact, so long as the personal knowledge, rational basis and helpfulness standards of Rule 701 are met. In particular, courts have permitted witnesses with firsthand knowledge to offer lay opinion testimony where they have a reasonable basis -- grounded either in

_____

[9]. United States v. McCullah, 745 F.2d 350, 352 (6th Cir. 1984) (permitting, in a prosecution for conspiracy to steal, transport, conceal and resell a tractor, the testimony of a government agent describing the location of the tractor as "hidden" under some trees, since it was rationally based on the perception of the witness and helpful to a clear understanding of his testimony); United States v. Sweeney, 688 F.2d 1131, 1145-46 (7th Cir. 1982) (concluding a PCP and methamphetamine drug user could testify as to identity of said drugs based on his prior use and knowledge, his sampling of the substance, and the conclusion that the drug affected him in the same manner as it had before); State v. No Heart, 353 N.W.2d 43, 48 (S.D. 1984) (holding that a police officer's opinion that victim's injuries were caused not by a fist but by something sharper was properly admitted, given that distinction between a wound caused by a fist and a wound caused by a sharper object was within realm of an average person's experience).

experience or specialized knowledge –– for arriving at the opinion expressed.  A conclusion by the trial court that the witness possessed sufficient experience or specialized knowledge has thus often been used to determine that the witness's opinion testimony satisfies the requirements that the opinion be both "helpful to a clear understanding . . . of a fact in issue" and "rationally based" upon the witness's perception, as expressed in the text of Rule 701.

Rule 701 cases satisfying these requirements are arrayed along a spectrum, ranging from what might be described as modest departures from the core area of lay opinion testimony, described above, to those which approach the ambit of Rule 702 expert opinion.  A good example of the former is our opinion in Teen-Ed, Inc. v. Kimbell International, Inc., 620 F.2d 399 (3d Cir. 1980) in which we held that a lay opinion from the plaintiff's accountant and bookkeeper was proper:

> The personal knowledge of appellant's balance sheets acquired by Zeitz as Teen-Ed's accountant was clearly sufficient under Rule 602 to qualify him as a witness eligible under Rule 701 to testify to his opinion of how lost profits could be calculated and to inferences that he could draw from his perception of Teen-Ed's books.
>
> The fact that Zeitz might have been able to qualify as an expert witness on the use of accepted accounting principles in the calculation of business losses should not have prevented his testifying on the basis of his knowledge of appellant's records about how lost profits could be calculated from the data contained therein.

Id. at 403.

Similar to Teen-Ed are our opinions in Joy Manufacturing Co. v. Sola Basic Industries, Inc., 697 F.2d 104, 110-12 (3d Cir. 1982), and Eckert v. Aliquippa & Southern Railroad Co., 828 F.2d 183, 185 n.5 (3d Cir. 1987).  In Joy, an action against a manufacturer for damages resulting from the failure of two heat treating furnaces, we held that it was an abuse of discretion for the district court to exclude the testimony of plaintiff's supervisor of production control concerning the percentage of plaintiff's losses resulting from hearth problems.  Given that the witness in question had extensive personal knowledge of plaintiff's plants and the furnaces in question, we concluded that the witness's opinion was rationally based on his personal knowledge and that the witness's inability to state precisely why a furnace was inoperable at a particular time was proper material for cross-examination rather than a basis for inadmissibility.

In Eckert, a brakeman sued a railroad under the Federal Employers Liability Act (FELA) and Safety Appliance Act (SAA) for injuries suffered when the locomotive he was riding on collided with another locomotive and both cars derailed upon failing to couple.  In concluding that the district court had improperly held the SAA inapplicable to the case, we noted that the plaintiff, who had offered testimony relevant to establishing SAA violations, was qualified to testify by virtue of his thirty years experience and familiarity with railroad procedures as to whether injuries would have occurred had the cars been properly coupled.  A number of other cases also fit into this category

(that is, they represent a modest expansion from the core lay opinion testimony contemplated by the adoption of Rule 701).[10]

## C.

We recognize, however, that some lay opinion cases have begun to move even further beyond the core area of Rule 701 opinion testimony and have begun, in a subtle gradation, to

[10]. See, e.g., State Office Sys., Inc. v. Olivetti Corp. of America, 762 F.2d 843, 845-46 (10th Cir. 1985) (permitting admission of testimony as to lost future profits from company's president/treasurer with personal knowledge of company's operations, sales, and profits); State v. Johnson, 719 P.2d 1248, 1256-57 (Mont. 1986) (holding that, in a prosecution for driving under the influence of alcohol, a police officer was properly allowed to testify as a lay witness on the basis of his own experience as to what generally happens to a car when its power steering fails, where he had worked on vehicles of all kinds for over ten years and had experienced power steering failure several times); Schmidt v. J.C. Robinson Seed Co., 370 N.W.2d 103, 106 (Neb. 1985) (holding that the trial court properly admitted, in a breach of contract action against a buyer of seed corn, opinion testimony by the plaintiff/seed grower's witnesses concerning the effect of shattercane on the seed crop, where the opinions, which were helpful in determining the fact in issue, were rationally based on perceptions stemming from extensive field observation and personal farming experience); Hansen v. Skate Ranch, Inc., 641 P.2d 517, 522-23 (N.M. Ct. App. 1982) (concluding, in a personal injury action arising from a fall at a roller skating rink, that the trial court properly admitted testimony of two lay witnesses, who were experienced skaters present on the night of the accident, regarding safety procedures used by the defendant on the night of the accident); Lee v. State, 661 P.2d 1345, 1354-55 (Okla. Crim. App. 1983) (concluding that an investigating police officer could testify that spots on a carpet were blood, and that a chemist, testifying on other matters, could offer a lay opinion that the type of glass found at a murder location was safety glass); Williamson v. O'Neill, 696 S.W.2d 431 (Tex. Ct. App. 1985) (holding that the driver of a tractor-trailer rig, a co-defendant in a personal injury lawsuit arising from an auto-truck accident, was uniquely qualified, as the experienced driver of the rig involved in the accident, to offer a lay opinion as to the reason the trailer separated from the tractor, since his opinion would be rationally based on his firsthand perceptions of the accident and would help determine causation).

permit lay witnesses to express their opinions in areas in which it would ordinarily be expected that only an expert qualified under Rule 702 could give such testimony, such as whether a product design was defective or whether certain factors (e.g., a product defect) caused an accident.

For example, in Soden v. Freightliner Corp., 714 F.2d 498, 510-12 (5th Cir. 1983), the Fifth Circuit permitted a lay witness to opine that the design of a truck was dangerous and defective in a product liability action involving a post-collision truck fire. The plaintiffs in this action claimed that the design of a Freightliner truck's fuel system was unreasonably dangerous and caused a post-collision fuel fire which killed plaintiffs' decedent. Soden, 714 F.2d at 500. The "thrust" of the plaintiffs' argument was that the Freightliner's fuel tanks, which were mounted on the sides of the truck under the cab doors, were dangerous. Id. As the Soden court explained:

> In particular, they [the plaintiffs] also argued that the brackets securing the steps to these fuel tanks had pointed ends which, in the event of a rollover, could puncture the fuel tanks. The resulting hole or holes could release diesel fuel near engine components hot enough to ignite the fuel, causing a fire in the engine-cab area.

Id.

The contested lay witness, Lasere, was a service manager who supervised the preventive maintenance of about 500 trucks and was in charge of the daily maintenance of about sixty trucks, mostly Freightliners, including the truck involved in the accident. Id. at 510. Lasere also was in charge of removing the

truck from the scene of the accident and observed firsthand the damage to the fuel tank. Id. At trial, he testified for the plaintiffs regarding the cause of the accident and the dangerousness of the design; specifically, Lasere testified that step brackets had punctured the fuel tank. Id. at 510-11. In particular, he stated that in the case at hand, and in two or three other Freightliner accidents, he had observed "puncture holes in the fuel tanks at the location of the step brackets." Id. at 510. He then gave his opinion that the step brackets were the cause of the puncture holes. After Soden's accident, Lasere testified that he had modified the step brackets in the remaining Freightliners in his fleet by "sawing off [the] pointed ends;" and he expressed the opinion that the bracket's original design was "dangerous." Id. at 511.

Sustaining the admission of Lasere's opinion testimony, the Fifth Circuit stated:

> No great leap of logic or expertise was necessary for one in Lasere's position to move from his observation of holes in Freightliner fuel tanks at the location of the step brackets, and presumably caused by them, to his opinion that the situation was dangerous. . . . Lasere's testimony with respect to the dangerousness of the step brackets was also obvious, given the modification which he testified he made to them after all he had seen.

Id. at 512. The court added, however, that Lasere's testimony on this point "did constitute an opinion which might have been better given by one more formally an expert." Id. And the court subsequently reiterated that "although Lasere's opinion with

respect to `dangerousness' may have been more properly made by one more formally an expert, <u>given the particular facts of this case</u>, we conclude that no reversible error occurred in its admission." <u>Id.</u> (emphasis supplied).

In our view, cases like <u>Soden</u> stretch the doctrinal boundaries of Rule 701 opinion testimony.[11]  However, we agree with the Fifth Circuit that such testimony does fall within the ambit of Rule 701's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue.  Though we agree with Benton Harbor that the admission of lay opinion evidence in these technical areas (e.g., concerning the existence <u>vel</u> <u>non</u> of a product defect or whether an accident was caused by a certain condition) can result in an attenuated form of expert opinion evidence far removed from the considerations, described <u>supra</u> in Part II.A, animating the lay opinion rule,[12] it is not for us to rewrite the

---

[11].  For example, in <u>United States v. Myers</u>, 972 F.2d 1566, 1577 (11th Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 1813 (1993), lay opinion testimony that burn marks were caused by a stun gun was held admissible based on the witness' personal perception of the burned skin and nineteen years of experience on the police force. The court noted that the opinion's lack of technical/medical basis could be exposed on cross-examination and affected the weight, not the admissibility, of the evidence.

[12].  In particular, we find problematic the views of some courts which would appear to permit the firsthand knowledge of a lay witness in these and other technical areas to entirely diminish the need for the "knowledge, skill, experience, training or education" of a witness qualifying under Rule 702.  For example, in <u>United States v. Paiva</u>, 892 F.2d 148, 155-57 (1st Cir. 1989), where a lay witness who had used and tasted cocaine on many occasions testified that a substance tasted like cocaine, the First Circuit affirmed the admission of the evidence by the trial court, rejecting the argument that a lay witness cannot testify

rule or reinterpret Rule 701 across the board.[13]  Accordingly, we refuse to hold, as Benton Harbor requests, that all lay witnesses offering opinions that require special knowledge or experience must qualify under Rule 702.[14]

(..continued)
to such matters because only qualified experts can give such testimony.  While the holding appears unexceptionable, the court unnecessarily declared that Rule 701 "blurred any rigid distinction that may have existed between" lay and expert testimony.  Id. at 157.  More refinement might have been in order.

[13].  This unwillingness to find a strict prohibition on lay opinion testimony in technical matters is motivated, in no small part, by our inability to designate the testimony involved in prior caselaw as properly within the exclusive province of experts.  Indeed, in some cases, courts have noted that the witness giving the lay opinion testimony might have qualified as an expert.  See, e.g., Teen-Ed, 620 F.2d at 403 (accountant who gave lay opinion testimony might have qualified as expert); see also Williams Enters., Inc. v. Sherman R. Smoot Co., 938 F.2d 230, 233-34 (D.C. Cir. 1991) (insurance broker, who might have been qualified as an expert, was properly permitted to testify that the construction collapse at issue may have contributed to a substantial increase in the plaintiff's insurance premiums); United States v. Fleishman, 684 F.2d 1329, 1335 (9th Cir.) (whether the testimony was lay or expert opinion, it was permissible for an undercover agent to testify that a defendant was acting as a lookout), cert. denied, 459 U.S. 1044 (1982).

[14].  We believe, however, that such distinctions can and might well be made by the drafters of the Federal Rules, in that, as our discussion suggests, a better formulation of the lay opinion rule would perhaps eliminate these matters from the ambit of Rule 701.  Such an approach has been adopted by some states, including Delaware, which provides:

> If a witness is not testifying as an expert, his testimony about what he perceived may be in the form of inference and opinion, when:
> > (1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he has perceived to the trier of fact without testifying in terms of inferences or opinions, and his use

However, the admissibility of opinion evidence under the strictures of Rule 701 is not without limit.  Rule 701's requirement that the opinion be "rationally based on the perception of the witness" demands more than that the witness have perceived something firsthand; rather, it requires that the witness's perception provide a truly rational basis for his or her opinion.  Similarly, the second requirement -- that the opinion be "helpful to a clear understanding of the witness's testimony or the determination of a fact in issue" -- demands more than that the opinion have a bearing on the issues in the case; in order to be "helpful," an opinion must be reasonably reliable.  In other words, Rule 701 requires that a lay opinion

(..continued)

> of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and
>
> (2) The opinions and inferences do not require a special knowledge, skill, experience or training.

DEL. UNIFORM RULES OF EVIDENCE RULE 701 (emphasis added). Similar restrictions on lay opinion testimony have been adopted in both Florida and Tennessee.  See FLA. STAT. ANN. EVIDENCE CODE § 90.701; TENN R. EVID. 701.

We take the liberty of commending this issue to the attention of the Judicial Conference Advisory Committee on Rules of Evidence, which monitors developments in evidence jurisprudence.  See generally Edward R. Becker & Aviva Orenstein, The Federal Rules of Evidence After Sixteen Years -- The Effect of "Plain Meaning" Jurisprudence, the Need for an Advisory Committee on the Rules of Evidence, and Suggestions for Selective Revisions of the Rules, 60 Geo. Wash. L. Rev. 857, 910 (1992). As the authors observed, state modifications in their adaptations of the Federal Rules can be quite instructive in providing "solutions to identified problems in the drafting or implementation of the Federal Rules."  Id. at 862 n.18.

witness have a reasonable basis grounded either in <u>experience or specialized knowledge</u> for arriving at the opinion that he or she expresses.  See Paiva, 892 F.2d at 157 ("Individual experience and knowledge of a lay witness may establish his or her competence, without qualification as an expert, to express an opinion on a particular subject outside the realm of common knowledge.").

In sum, for lay opinion as to technical matters such as product defect or causation to be admissible, it must derive from a sufficiently qualified source as to be reliable and hence helpful to the jury.  In order to satisfy these Rule 701 requirements, the trial judge should rigorously examine the reliability of the lay opinion by ensuring that the witness possesses sufficient special knowledge or experience which is germane to the lay opinion offered.  Our decision does not, as suggested by the dissent, "limit the application of Rule 701 to human experiences, human conditions, and, perhaps, vehicle speed and property value," nor does it eliminate lay opinion as an aid to the jury in technical matters.  Rather, as we have stated, a lay witness with first-hand knowledge _can_ offer an opinion akin to expert testimony in most cases, so long as the trial judge determines that the witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion.

The importance of these precepts is reinforced by the recent decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S. Ct. 2786 (1993).  Daubert, of course, deals with the evaluation of the scientific testimony of an expert

focusing upon the reliability of the scientific method on which the conclusions of an expert are based.  But, one of the "Daubert factors" is the expert's knowledge and qualifications, and the centerpiece of the Daubert regime is the gatekeeping role of the trial judge, whose duty it is to screen challenged expert testimony and assure that it is sufficiently reliable to be of assistance to the jury.  Daubert, 113 S. Ct. at 2794-95; In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 748 (3d Cir. 1994) ("Daubert makes clear for the first time at the Supreme Court level that courts have to play a gatekeeping role with regard to experts.").  While we are careful not to suggest that Daubert applies to Rule 701, we believe that its spirit also counsels trial judges to carefully exercise a screening function with respect to Rule 701 opinion testimony when the lay opinion offered closely resembles expert testimony.[15]

Though we acknowledge that important differences between lay opinion evidence and expert testimony exist, justifying a greater level of scrutiny of Rule 702 expert opinion evidence,[16] we do not believe such differences effectively

[15].  The dissent's assertion that our decision "is directly contrary to the teaching of Daubert which focused on the language of Rule 702" is simply inaccurate.  Our conclusion that the trial judge should rigorously examine the reliability of the opinion, by ensuring that the witness possessed sufficient special knowledge or experience, derives ultimately, as we have stated, from the explicit requirements of Rule 701, which dictate that the lay opinion be "rationally based" on the witness's observations and "helpful" to the jury.

[16].  Such differences include the following: (1) designation of an opinion as "expert" by the court may cause the jury to give the "witness more attention and credence" then an opinion admitted from a "lay person" under Rule 701, Richey, supra, 154

vitiate the need for some judicial gatekeeping on the part of the trial judge in the case of lay opinion testimony of a technical nature. Allowing a witness, with first-hand knowledge, to offer a technical opinion which he lacks the necessary knowledge and experience to make, runs afoul of the requirements of Rule 701. It is clear, therefore, that in appropriate circumstances a trial court should exclude proffered evidence, otherwise admissible as relevant under Fed R. Evid. 401, on grounds that the witness's knowledge and the consequent basis for his or her rational perception are insufficient under the rule.

The judicial Rule 701 screening that we speak of for cases such as this one is not very different from the screening that attends the ordinary expert qualification ruling. See Paoli, 35 F.3d at 740-46. In determining whether a lay witness has sufficient special knowledge or experience to ensure that the lay opinion is rationally derived from the witness's observation and helpful to the jury, the trial court should focus on the substance of the witness's background and its germaneness to the issue at hand. Though particular educational training is of course not necessary, the court should require the proponent of the testimony to show some connection between the special knowledge or experience of the witness, however acquired, and the

(..continued)
F.R.D. at 544; and (2) the opinion of a lay witness must be based on his or her personal firsthand perception, while an expert may opine in response to hypothetical questions, see Teen-Ed, 620 F.2d at 404 ("The essential difference [between Rule 701 and 702], however, is that a qualified expert may answer hypothetical questions.").

witness's opinion regarding the disputed factual issues in the case.

The lay opinion testimony held to be admissible in our prior Rule 701 decisions satisfied this standard. In <u>Teen–Ed, Inc. v. Kimball International, Inc.</u>, 620 F.2d at 399, the accountant who testified as a lay witness had very particular and quite extensive prior experience with Teen–Ed's books, which allowed him to properly calculate for the court how lost profits should be determined and to draw inferences from his examination of the accounts.[17]  <u>Id.</u> at 403.  And in <u>Joy Manufacturing Co. v. Sola Basic Industries, Inc.</u>, 697 F.2d 104 (3d Cir. 1982), the lay witness had "extensive personal knowledge of Joy's [the plaintiff's] plants, its on–going heat treating processes, and the two furnaces in question," and we stated that he had "sufficient personal knowledge of Joy's [the plaintiff's] heat treating facility to make an estimate of what amount of downtime was due to the hearth problems."  <u>Id.</u> at 111–12.

Moreover, in <u>In re Merritt Logan, Inc.</u>, 901 F.2d 349 (3d Cir. 1990), an action by the purchaser of an allegedly defective refrigeration system against the seller, installer, and manufacturer of the system, the principal shareholder of the plaintiff (Logan) was permitted to express an opinion as a lay

---

[17].  Moreover, <u>Teen–Ed</u> is a case in which the witness would have qualified under Rule 702, but was precluded from testifying as an expert because Teen–Ed failed to list him as required in a pre-trial order.  <u>Id.</u> ("We interpret the pre-trial ruling in this case to have required identification of expert witnesses under Rules 702 and 703, but not of lay witnesses under Rule 701.").

witness concerning his company's lost profits.  In addition, another witness, Gilchrist, who had surveyed the site where the refrigeration system was to be located prior to its installation and had made an estimate of the weekly sales that could be achieved at that site, was permitted to testify concerning his survey.  We held that the admission of these lay opinions was proper under Rule 701, stating:  "Mr. Logan's personal knowledge of his business and Gilchrist's personal knowledge of how he prepared his survey were sufficient to make these witnesses eligible under Rule 701 to testify as to how lost profits could be calculated."  Id. at 360.[18]

Mindful of the need for the proponent of technical lay opinion testimony to show that the witness possesses sufficient knowledge or experience which is germane to the lay opinion offered, we turn to the facts of this case.

_____

[18].  See also Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir.) (involving a securities action where the plaintiffs claimed that the offering memoranda for certain limited partnerships were false and misleading), cert. denied, 474 U.S. 946 (1985).  In Eisenberg, we held that an attorney had properly been permitted to testify as a lay witness with respect to "what he believed should have been included in one of the private offering memoranda and as to whether the memorandum complied with the applicable disclosure requirements."  Id. at 780.  We noted that the witness, a partner of one of the individual defendants and a principal in a law firm named as a defendant, had sufficient knowledge and experience as "a lawyer specializing in business litigation, who ha[d] also acted as general counsel for banks, trucking companies and brokerage houses."  Id. ("Although he had represented clients in securities cases, and testified that he was familiar with the disclosure requirements of federal and state securities laws, he did not view himself as expert in the preparation of offering memoranda.").

III.  Application of Rule 701 to Jones's Opinion Testimony

To recapitulate, the testimony in question here is Jones's opinion that the accident had resulted from metal fatigue inside a piston rod which he attributed to the faulty design of Benton Harbor's rod end.  The district court did not limit Jones's testimony to describing the state of the metal inside the rod-end and the fact that it had broken.  Rather, it allowed Jones to offer a lay opinion as to the cause of the break.  Specifically, Jones stated that there was a "problem" because Benton Harbor's design called for a hole to be drilled through the rod end at a point where it was threaded.  App. at 161 & 167.  The district court admitted Jones's testimony pursuant to Rule 701, since it concluded it was within "the ambit of common sense."

Asplundh contends that the district court properly admitted Jones's opinion since the opinion satisfies Rule 701's requirements in that it was rationally based on Jones's firsthand observations of the fractured rod and helpful to a determination of a fact in issue.  We agree that Jones's testimony satisfied Rule 701's requirement of firsthand knowledge since: (1) he saw the disassembled lift shortly after the accident from a distance of approximately fifteen inches; (2) he observed the colorations of the metal fracture surface; and (3) he saw the break in the threaded area where a hole had been drilled through the rod.  But we do not agree that his opinion was rationally based on these observations or helpful to the jury's determination of a fact in issue because in proffering Jones's testimony, Asplundh failed to

satisfy the standard we articulate today for lay opinion evidence.

In particular, we conclude that the district court applied an incorrect legal standard under Rule 701 to the extent that it failed to require Asplundh to show a sufficient knowledge or experience and sufficient connection between Jones's special knowledge or experience and his opinion regarding the cause of the accident and the design of the hydraulic cylinder.[19]  While the district court did summarily conclude at one point in its analysis that Jones's "employment experience" gave him "substantial knowledge in this area," we do not believe it examined with sufficient rigor the question whether Jones possessed the knowledge or experience necessary to offer an opinion of such a technical nature.

Jones was the fleet maintenance supervisor for the city of Portland for more than ten years, supervising the maintenance of 1385 variegated pieces of equipment and six or seven repair shops.  Jones was present when the aerial lift was disassembled and observed the damage to the rod.  Asplundh suggests that, as in Soden, the conclusions and opinions expressed by Jones were

---

[19].  The dissent contends that the district court did apply a correct legal standard under Rule 701 and would therefore review the district court's decision to admit Jones's testimony for abuse of discretion.  We disagree, given that we conclude that the district court violated the "rationally derived" and "helpfulness" standards of Rule 701 in failing to examine with sufficient rigor the question of whether Jones possessed appropriate experience or knowledge to offer an opinion regarding the cause of metal failure and the proper design of hydraulic cylinders.

those that a normal individual in his position with his experience would have drawn.  See Soden, 714 F.2d at 512.  But Benton Harbor's response is telling.  It points out that Jones lacked formal education; had not taken courses in metallurgy, material failures or metal fatigue; and had not designed a hydraulic cylinder.  He had one year of college studies plus other job-related courses.  Moreover, Jones had never conducted any studies of materials or material compositions.  Besides having never designed a hydraulic cylinder, he had never personally participated in manufacturing a hydraulic cylinder.  Although he worked some seven or eight months as a production control manager for a company which used hydraulic cylinders in their product, in that position he was responsible only for initiating manufacture and had no design responsibilities notwithstanding his bold assertion, "I think I know how to make hydraulic cylinders."  App. at 168.

The question we are presented with is whether it was permissible for Jones to express the opinion that the rod end had broken due to metal fatigue and that the design of the rod end was a "problem."  App. at 160-61 ("The reasons [for the accident] are two: one, the hole through the pin caused . . . the rod to be weakened and, two, the threads . . . on the rod itself caused the breaking point.  They were sharp, and it broke right at the point where all of those things intersected.  That was the problem.  There's no doubt in my mind about it . . . .").  In our view these opinions are not ones that an average lay person would be equipped to draw, absent sufficient evidence of specialized

knowledge or experience.  We disagree with the dissent's assertion that "[f]atigue failure of metal is not unfamiliar" to persons "such" as Jones, and simply do not believe that the average lay person, dissent infra at page 16, absent sufficient knowledge or experience with metals, is qualified to offer a meaningful opinion on questions of metal fatigue of this nature. Metal fatigue is a technical concept.  There are many reported cases in which experts have testified (and disagreed) as to whether metal fatigue could be detected based on a post-accident examination,[20] but we have not found a single reported case in which a lay witness has given such testimony.  The consistent use of experts to testify regarding such questions underscores the technical nature of Jones's opinion.

In describing this testimony as within the "ambit of common sense," the district court would characterize Jones's testimony as equivalent to the observation that "if you take a piece of metal and put in a vice and bend it back and forth enough times, it fatigues and it breaks."  The dissent agrees. But, Jones's opinion was far more technical and, in particular, attributed the accident to the manner in which Benton Harbor had chosen to design the rod end.  See App. at 167-68 (Jones attributed the accident to the fact that the "rod was drilled

---

[20].  See, e.g., Fusco v. General Motors Corp., 11 F.3d 259, 261 (1st Cir. 1993); Marrocco v. General Motors Corp., 966 F.2d 220, 225 (7th Cir. 1992); Salter v. Westra, 904 F.2d 1517, 1520 (11th Cir. 1990); Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784, 789 (6th Cir. 1984); Southwire Co. v. Beloit Eastern Corp., 370 F. Supp. 842 (E.D. Pa. 1974).

through, and the fact that the rod eye was screwed on on a threaded -- two threaded surfaces," and questioned this design since he "kn[e]w how to make hydraulic cylinders" and he "had never seen a cylinder that size configured that way").

While the average lay person -- after examining the rod end and seeing that it had broken in a spot where the rod end was threaded and a hole had been drilled through it -- might well properly conclude under Rule 701 that the rod end had broken at what appeared to be its weakest point, such a person could not reasonably go further and conclude that the rod end was defectively weak at this point. The dissent contends the admissibility of this testimony was proper since "this is a nation where many individuals grow up with extensive mechanical experience and capabilities." Dissent infra at page 14. We simply do not believe that the realm of common knowledge extends to such issues as the presence and cause of metal failure and the proper design of hydraulic cylinders. Given the requirements of Rule 701, Asplundh needed to demonstrate that Jones possessed relevant experience or specialized knowledge germane to his opinion in order to satisfy the rationally derived and helpfulness standards of the rule. While a lay witness may acquire this additional insight either by formal education or practical experience, it appears Jones simply possessed neither.[21]

---

[21]. The dissent asserts, infra at page 13, that "Jones had substantial technical knowledge so as to tell whether metal is fatigued" but then fails to point to any evidence which would demonstrate that Jones had any knowledge or experience in

Jones's experience as Portland's fleet maintenance supervisor, supervising the upkeep of 1385 pieces of equipment and six or seven repair shops, is inapplicable.  While these are weighty responsibilities, they do not seem to have anything to do with designing or evaluating the design of machinery.  By way of example, the maintenance supervisor for a fleet of rental cars would hardly be qualified to express an opinion on whether the braking system of a particular model was defectively designed, absent some special qualifying proffer.  Moreover, as fleet maintenance supervisor, Jones was involved in supervising the maintenance of numerous types of equipment and had no special experience with metal failure or hydraulic cylinders.  Likewise, Jones's prior employment experience as a production control manager does not seem pertinent, since he had no design responsibilities.  Equally inapplicable is Jones's previous job as a riveter in the manufacture of blowoff fuel tanks for military aircraft and the fact that he repaired his own automobile.  App. at 181.  Neither appear to enhance Jones's knowledge or experience to offer an opinion on metal fatigue or the design of hydraulic cylinders.

In support of the admission of Jones's opinion testimony, Asplundh relies principally on the Fifth Circuit's opinion in <u>Soden</u>, discussed <u>supra</u>, which, as we have stated,

(..continued)
assessing metal fatigue.  Absent some evidence of such experience or knowledge, Jones's opinion was inadmissible under Rule 701 since it could not be rationally derived from his observations or helpful to the jury.

would likely satisfy the standard we articulate today. While we acknowledge that Jones's testimony bears a certain similarity to Lasere's opinion regarding the design of the Freightliner fuel tanks, we believe Jones simply lacked the unique experience which allowed Lasere, the witness in Soden, to properly offer his lay opinion.

The Fifth Circuit concluded that the testimony of Lasere was properly admitted under Rule 701 on the grounds that he had eighteen years of experience in repair and maintenance of the particular trucks involved in the accident and, importantly, he had actually modified these trucks, which were under his care, so as to prevent the alleged defect in the truck's design from rupturing the freightliner's fuel tank in future accidents. Lasere actually examined on previous occasions an unknown number of Freightliners that had been involved in serious accidents (presumably, in light of the nature of his job, not a great number), and in two or three of those cases he had observed facts that provided a reasonable basis for inferring that the design of the step brackets had caused holes in one of the fuel tanks, which were located near the engine. Moreover, he had devised a simple means (sawing off the pointed ends) by which the step brackets might be made safer.

More importantly, Lasere's opinion, regarding the dangerousness of the design of the Freightliner, was rationally derived from his particular experience with the Freightliners'

fuel tanks.[22]  This experience allowed the Fifth Circuit to
conclude that Lasere had "very considerable practical experience
and specialized knowledge."  Soden, 714 F.2d at 511.  Given his
unique experience, the court was able to conclude that his
conclusion that the design of the step brackets was dangerous
required "no great leap in logic or expertise."  Id. at 512.

    While we agree with the dissent that the opinion
admitted in Soden went, in a sense, beyond that offered by Jones
since Lasere characterized the design of the Freightliner's fuel
tanks as "dangerous," we believe, given Lasere's unique knowledge
and experience with the truck's fuel tanks, he was qualified to
draw such an opinion.  In contrast, Jones simply lacked anything
resembling Lasere's specialized knowledge or experience.  In
particular, Jones had never before taken these cylinders apart in
association with similar accidents.  Moreover, unlike Lasere,
Jones had never taken any steps to modify, what he perceived to
be, the faulty design of the rod end.

    Asplundh does not respond to the problem of Jones's
lack of specialized knowledge and experience.  Rather, it
suggests that it is enough that Jones observed the rod end
firsthand, that his opinion testimony helped the jury to
determine the cause of the lift's failure and the role played in

---

[22]. As noted, Lasere's bases for his opinion were:  (1) the
design featured pointed step brackets resting on the fuel tanks;
(2) the fuel tanks were near the cab and the engine; (3) the
reasonable inference that this design had a tendency to cause
punctures of the tanks in roll-over accidents; and (4) and the
fact that he found a simple way to make the design safer.

it by the rod manufactured by Benton Harbor, and that Jones was subject to cross-examination. We disagree. As we have stated, under Rule 701 the trial judge must play some gatekeeping role so as to ensure that the rationally derived and helpfulness requirements of the rule are met.

To use a simple yet illustrative example, if an issue in a case was whether the sun revolved around the earth, and the proponents of the Ptolemaic system proposed to prove their case by lay opinion testimony, such testimony could satisfy Asplundh's requirement of "firsthand" observation ("I have observed the sun firsthand for many years, and I have seen that each day it moves across the sky from the east to the west."). Such testimony would also be helpful to the jury to the extent that it would tend to suggest a result that the jury should reach. And such testimony could be subjected to cross-examination by a proponent of the Copernican system. But it does not follow that this lay opinion testimony meets the rational basis or helpfulness requirements as they are contemplated by Rule 701 or that it would be admissible. Yet nothing in the district court's analysis would have excluded such testimony.


IV. <u>Conclusion</u>

We are convinced that the court's admission of Jones's opinion testimony was not harmless and therefore represents reversible error, since we cannot conclude that "it is highly probable that the error did not contribute to the judgment."

<u>Advanced Med. Inc. v. Arden Med. Sys.</u>, 955 F.2d 188, 199 (3d Cir. 1992).  As we have explained, the district court erred in admitting Jones's testimony under Rule 701 by failing to apply its analysis with the rigor required in this type of case.  More particularly, the district court needed to determine whether Jones's knowledge or experience qualified him to offer an opinion which attributed the accident to metal failure and the allegedly improper design of Benton Harbor's hydraulic cylinder.  There is no indication in the record that Jones possessed sufficient knowledge or experience to allow Asplundh to satisfy the standard articulated today and obtain admission of Jones's opinion.  Nevertheless, we will remand the case to allow the district court to determine, in light of our opinion, whether to permit further proceedings to qualify Jones's opinion.  In the absence of such proceedings or the establishment of such qualification, the district court should order a new trial.

The judgment of the district court and its order denying the motion for a new trial will be reversed and the case remanded for further proceedings consistent with this opinion.

_____

JOHN R. GIBSON, Senior Circuit Judge, dissenting.

I respectfully dissent.

The Court today painstakingly analyzes the history of Rule 701 and its intended relaxation of the rules regarding opinion evidence. The Court then develops a "core area" of Rule 701 lay opinion testimony and unduly limits the admissibility of testimony outside of that core area. In order to do so, the Court imposes on Rule 701 the language and requirements of Rule 702 that a demonstration of the witness's knowledge and experience support the opinion, and thus abrogates the distinction between Rule 701 and 702 in the area of technical opinion evidence. The Court then determines that the district court did not use "sufficient rigor" in determining "whether the testimony in question was informed by sufficient experience or specialized knowledge," supra at 4, and utilizes an essentially discretionary rule under the guise of plenary review. In my view, the district court properly applied Rule 701, and did not abuse its discretion in admitting the evidence.

**I.**

Today the Court argues that the district judge's ruling on the admissibility of Jones's opinion evidence involved interpretation of Rule 701 and, accordingly, should be given

plenary review. The authority relied upon simply does not bear the weight which the Court places on it.

In DeLuca v. Merrell Dow Pharmaceuticals, Inc., 911 F.2d 941 (3d Cir. 1990), this Court held that the district court's "cursory" ruling excluding expert testimony erroneously interpreted the Federal Rules in two respects: (1) the court analyzed the expert's qualifications under Rule 703, rather than Rule 702, id. at 953; and (2) the court implicitly required the expert to accept a study's conclusion in order to utilize the underlying data as a basis for testimony, although Rule 703 contains no such requirement. Id. at 954. Because admissibility depended on the district judge's interpretation of Rule 703, the Court applied a plenary standard of review, id. at 944, and remanded the case for further consideration of the proffered testimony. Id. at 956-57. Most tellingly, the Court instructed that the ruling on remand should display "sensitivity to the relevant policy judgments reflected in the Federal Rules of Evidence," which "embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process." Id. at 956.

The Court also relies on United States v. Furst, 886 F.2d 558 (3d Cir. 1989), cert. denied, 493 U.S. 1062 (1990), which held that there was insufficient foundation for the admission of business records. Id. at 572. In Furst, the Court

articulated the rule the Court today espouses, id. at 571, but did not further indicate which standard it used, stating only that "the district court erred" in admitting the evidence. Id. at 573.

Most significantly, however, both DeLuca and Furst rely upon In re Japanese Electronic Products Antitrust Litigation, 723 F.2d 238, 265 (3d Cir. 1983), rev'd on other grounds sub nom., Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). In that case, this Court held:

> The scope of our review . . . depends on the basis for the [trial court's] ruling. When the trial court makes Rule 104(a) findings of historical fact . . . we review by the clearly erroneous standard of Fed.R.Civ.P. 52. But a determination [by the trial court], if predicated on factors properly extraneous to such a determination, would be an error of law. There is no discretion to rely on improper factors. . . . In weighing factors which we consider proper, the trial court exercises discretion and we review for abuse of discretion.

Id. at 265-66. The Court proceeded to apply all three standards. Most critically relevant for our purposes, the Court held that the district court erred in developing its own standards and in acting as the ultimate arbiter of the reliability of the materials upon which the expert based his opinion. See Zenith Radio Corp. v. Matsushita Elec. Indus. Co., 505 F. Supp. 1313, 1321-30 (E.D. Pa. 1981), rev'd, In re Japanese Elec. Prods., 723

F.2d 238. This Court held the district court's approach to be "fundamental legal error because, as a matter of law, the district court must make a factual inquiry and finding as to what data experts in the field find reliable." In re Japanese Elec. Prods., 723 F.2d at 277.[23] This Court held that the district court's approach "reject[ed] the decision of the Judicial Conference, the Supreme Court, and Congress" in "adher[ing] to an unusually restrictive view as to the basis on which an expert's opinion may be laid." Id. at 277. The ruling of the district court, containing legal interpretation of the meaning of the Rule, was correctly subjected to review under a plenary standard.

The record before us stands in sharp contrast to that in DeLuca and Furst, and, particularly, to that in In re Japanese Electronic Products. In the case before us, the district court did not involve itself in an interpretation of the Rule as in DeLuca and In re Japanese Electronic Products. Those cases cannot support application of the rule of plenary review in this case.

Nothing in the record indicates that the district judge engaged in interpretative analysis of the meaning of Rule

_____

[23]. In In re Paoli Railroad Yard PCB Litigation, 35 F.3d 717 (3d Cir. 1994), cert. denied, 115 S. Ct. 1253 (1995), this Court followed Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993), and rejected its substantive discussion concerning Rule 703 in In re Japanese Electronic Products. Paoli, 35 F.3d at 747-748. More significant for our purposes, Paoli continued to recognize plenary review of a district court's interpretation of a Federal Rule of Evidence. Id. at 749.

701.  Rather, the district judge carefully analyzed Jones's deposition testimony and found it admissible by applying the Rule.  His analysis was quintessentially an exercise of discretion which should be reviewed only for abuse and be given substantial deference.  The Court today pays no heed to the district court's thorough and detailed ruling on the admissibility of Jones's testimony, but simply casts that ruling aside on the basis of this Court's own analysis.

## II.

A close look at the record reveals that the district judge exercised great care in ruling on the admissibility of this evidence.  After reading a portion of the deposition during consideration of the objections, the district judge remarked:

> Just because you [sic] don't have a sheepskin doesn't mean he is not an expert.  It seems to me he has substantial knowledge in this area, so that because of his employment experience, many years on the job, he can tell whether metal is fatigued; he can tell whether screws, threads, threading of screws, whatever are shorn, whatever, going beyond the ken of a lay person.

(Emphasis added).

The district judge specifically articulated Asplundh's argument that Jones testified as an expert,

not a lay person, and stated that "[u]nder [Rule] 701, of course, we are talking about lay opinion." The district court expanded upon this by stating:    This guy is not an expert.  However, he has all this experience, these are his opinions, these are the reasons for his opinions, but we are not going to call him as an expert.  We want to get the evidence in, let the jury assess it in view of his umpteen years on the force.

After dismissing the jury, the district judge commented to counsel that:

> I don't have any background in metallurgy, but I can take this paper clip and I can bend it for a while.  I can give you a pretty good idea when I think it's going to break because of metal fatigue. And all I do is occasionally use paper clips.  That is a lay opinion.

After considering whether the rod's weakness required expert opinion, the district judge commented:  "That would fall within the ambit of common sense embraced by both sides here."

> The next morning, the district judge ruled: Counsel, with respect to the [Rule] 701 issue, I have been reviewing

> the transcript. . . .  So, under
> all the circumstances looking at
> Rule 701, as I must, and finding
> ample explanation, be it valid or
> not within the record for the 701,
> allegedly 701 opinions there
> adduced, I am going to overrule the
> objection and permit that testimony
> to be read.  I believe it goes to
> the weight.

The record before us reveals a painstaking study of the deposition testimony of Jones and the application of Rule 701 in determining that it was admissible.  This evidentiary ruling is palpably an exercise of discretion rather than an interpretation of the Rule.

**III.**

The Court today rewrites Rule 701, holding that the district court misinterpreted Rule 701 by failing to examine with sufficient rigor whether Jones possessed the knowledge or experience necessary to offer an opinion of a technical nature. Supra at 4.  When the Court's lengthy analysis and discussion is stripped aside, the holding has two parts:  first, the Court has interpreted Rule 701 to incorporate the Rule 702 requirement that there be a demonstration that the witness possesses sufficient experience or specialized knowledge to qualify the witness to express a technical opinion; second, the Court requires that this Rule be examined with sufficient rigor.

The Court articulates the experience and knowledge requirement after an exercise in ambivalence.  The Court first

refuses to hold "that all lay witnesses offering opinions that require special knowledge or experience must qualify under Rule 702." _Supra_ at 23. It so states after having found problematic the views of some courts which would permit a lay witness in technical areas to diminish the need for the "knowledge, skill, experience, training or education" of the witness qualifying under Rule 702. _Supra_ at 22 n.14. The Court then states that "the admissibility of opinion evidence under the strictures of Rule 701 is not without limit," and reads the language of the Rule to require that "a lay opinion witness have a reasonable basis grounded either in _experience or specialized knowledge_ for arriving at the opinion he or she expresses." _Supra_ at 24-25. The Court comments "[t]he judicial Rule 701 screening that we speak of for cases such as this one is not very different from the screening that attends the ordinary expert qualification ruling." _Supra_ at 27. It goes so far as to commend the rule followed in Delaware which excludes lay opinion requiring special knowledge, skill, experience or training. _Supra_ at 23-24 n.16.

The Court holds that "[i]n order to satisfy these Rule 701 requirements, the trial judge should rigorously examine the reliability of the lay opinion by ensuring that the witness possesses sufficient special knowledge or experience which is germane to the lay opinion offered." _Supra_ at 25. These are not requirements of Rule 701, but rather Rule 702. Thus, as much as the Court protests, it has indeed stitched to the fabric of Rule

701 the language and requirements of Rule 702.  This is directly contrary to the teaching of Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S. Ct. 2786 (1993), which focused on the language of the Rule 702, in issue before it.

If the Court stopped at this point, we could simply observe that the district court made the appropriate findings of experience and knowledge germane to the profferred opinion, based on a lengthy colloquy with counsel and a complete study of the deposition testimony overnight, before admitting the testimony under Rule 701.

The Court today, however, does not stop with incorporating the provisions of Rule 702 into Rule 701.  It adds the "sufficient rigor" requirement, which it gives plenary review.

Indeed, the basis of the Court's decision is that the district court made an impermissible interpretation of Rule 701 because it "failed to examine with sufficient rigor" whether the testimony was informed by sufficient experience or specialized knowledge.  Interpretation of a rule requires a determination of the meaning of the language of the rule.  On the contrary, failure to examine the testimony with sufficient rigor involves a value judgment and a weighing of factors, which inherently relate to the exercise of discretion.  Failure to examine with sufficient rigor simply does not equate to

interpretation.  The rationale of the Court can find support only from Lewis Carroll.[24]

Further, the sufficient rigor test creates no legal yardstick upon which the district court's ruling can be measured.  Certainly, with respect to Rule 701 and numerous other evidence questions, the admissibility of evidence involves a determination of where on a spectrum the testimony falls.  This is reason for applying an abuse of discretion test to such considerations.  It is, however, the trial court's determination of such questions to which we apply the abuse of discretion rule. Here, the Court has simply moved the exercise of discretion from the district court and into the hands of the appellate court. What is sufficient rigor and what is not simply becomes a call for the appellate court, not unlike the decision of a baseball umpire, except there is no definition of the strike zone.

The Court finds it necessary to concede that the district court "did summarily conclude at one point in its analysis that Jones's 'employment experience' gave him

---

[2]. Carroll wrote:

> "When $\underline{I}$ use a word," Humpty Dumpty said, in  rather a scornful tone, "it means just what I choose it to mean--neither more nor less."

> "The question is," said Alice, "whether you $\underline{can}$ make words mean so many different things."

LEWIS CARROLL, THE ANNOTATED ALICE:  ALICE'S ADVENTURES IN WONDERLAND & THROUGH THE LOOKING GLASS 269 (Clarkson N. Potter, New York 1960).

'substantial knowledge in this area,'" but that the court did not examine "with sufficient rigor the question whether Jones possessed the knowledge or experience necessary to offer an opinion of such a technical nature." Supra at 31. The Court today simply refuses to accept that the district court, with a firm understanding of the requirements of Rule 701, made appropriate and sufficient findings to support the admissibility of the evidence.

The Court's rewritten Rule 701 replaces the district court's discretion on admitting or rejecting evidence with appellate discretion exercised under a formula with no true objective standard and plenary review. The Court effectively switches the roles of the trial and appellate courts.

**IV.**

This Court has held that a trial court's determination of the admissibility of lay opinion testimony "may be overturned only for clear abuse of discretion." Joy Mfg. Co. v. Sola Basic Indus., Inc., 697 F.2d 104, 111 (3d Cir. 1982). Weinstein's Evidence, citing numerous cases, states succinctly: "Basically, Rule 701 is a rule of discretion." 3 JACK B. WEINSTEIN ET AL., WEINSTEIN'S EVIDENCE ¶ 701[02], at 701-31 (1995). The district court's careful ruling, which we have discussed above, and the record upon which it was based compellingly demonstrate

that the court did not abuse its discretion in admitting the testimony of Jones.

Jones testified regarding differentiations in color at the fracture site and that the rod fatigued and broke.[25] He also testified that the stop blocks were not relevant to the accident[26] because the rod eye broke off due to the way the rod

---

[3]. ASPLUNDH'S COUNSEL:  With respect to the cylinder rod portion, the broken end, what with respect to the color of the broken end did you observe?
    JONES:  Well, one was oxidized.  The one that had been broken prior or earlier on was oxidized.
    ASPLUNDH'S COUNSEL:  When you say "oxidized" —
    JONES:  It's a different color.  It's duller — more dull.
    . . .
    JONES:  And the fresh break was simply fresh.

See App. at 162.

    ASPLUNDH'S COUNSEL:  Can you tell me upon what you base the opinions you just gave on?
    . . .
    JONES:  Well, I saw the rod removed from the eye.  I saw where it had fatigued and broke halfway through, and then I saw where it was a fresh break.  So one shows something that had been broken for a long period of time and another one breaking recently.  And it broke at the thread, and it broke through the place where the pin was installed.

See App. at 160–61.

[4]. ASPLUNDH'S COUNSEL:  Why do you say that it's your belief that [the stop blocks] have no bearing on the case?
    . . .
    JONES:  Okay.  Because the presence of those blocks, whether they're there or not there would not have stopped the breaking of — off the rod eye.  They're not relevant.
    ASPLUNDH'S COUNSEL:  Why do you say that?
    . . .

end was drilled through, threaded, and, thus, weakened.[27]  He concluded that this was the problem which caused the failure of the boom.  He further stated that he had not seen a cylinder configured in this way.

Jones's observations were based upon his practical experience.  He was fleet maintenance supervisor for the City of Portland at the time of the accident and had held this position for over ten years, supervising between 60 and 100 employees, 6 or 7 city repair shops, and the maintenance of 1,385 pieces of equipment, including the Asplundh aerial lift.  In that job, Jones spent 30 percent of his time overseeing the work done and had done mechanical work himself.  In a previous job, he riveted

---

(..continued)

    JONES:  Because the rod eye broke off because of the way the end of the rod was drilled to secure a screw on the rod eye.

See App. at 159–60.

[5].  ASPLUNDH'S COUNSEL:  Okay.  As fleet maintenance manager for the City of Portland, did you develop a conclusion as to why the accident occurred?
        . . .
    JONES:  The reason that this thing broke and Sackerson was killed is because of the way the rod itself fatigued inside the rod eye.  First one half and then the other half went to ultimate at the time it finally eventually broke.  The reasons are two:  one, the hole through the pin caused the — yeah, the rod to be weakened and, two, the threads on the eye itself — on the rod itself caused a breaking point.  They were sharp, and it broke right at that point where all of those things intersected.  That was the problem.  There's no doubt in my mind about it,
. . . .

App. at 160–61.

blowoff fuel tanks for military aircraft.  He stated that he had a high mechanical aptitude and understood the way things worked. Some of the deposition transcript upon which the district court based its ruling is significant, although not introduced into evidence at trial.  For example, Jones stated:

> Well, even if you work in your own garage, if you take a piece of metal and put it in a vice and bend it back and forth enough times, it fatigues and it breaks.  Anyone who's ever dealt with anything solid knows that.  You can do it with a paper clip, bend it until it breaks.  That's fatigue.  I certainly know what metal fatigue is through my own knowledge and discovery of the way life works.

Given Jones's experience, the district court did not abuse its discretion in concluding that he was qualified to express a lay opinion on metal fatigue.

Indeed, the district court considered the factors the Court today requires, specifically, Jones's substantial knowledge, employment experience, and years on the job.  Any interpretation of Rule 701 in this case springs from this Court's own analysis, rather than the application of Rule 701 by the district court.  As the district court simply applied Rule 701 to the proffered testimony, we must judge that determination on an abuse of discretion basis.

The Court today simply gives insufficient weight to the district court's articulated reasoning that his opinion was based on his experience and that Jones had substantial

technical knowledge so as to tell whether metal is fatigued and whether threads are shorn, which goes beyond the ken of a layperson.  The Court should not reject the articulated reasoning of the district court so facilely.

The Court today firmly asserts that metal fatigue is a technical concept, and that "the realm of common knowledge [does not extend] to such issues as the presence and cause of metal failure and the proper design of hydraulic cylinders." Supra at 34.  The Court switches the roles of the trial court and the appellate court.  The district court made abundant findings not only on Jones's knowledge and experience, but also on the common knowledge concerning metal fatigue.  It is the appropriate role of the district court to make such findings.  Today, the Court simply rejects these views and appropriates the factfinding role to itself.

Perhaps the physical process of metal fatigue requires technical knowledge, but the appearance of a metal fracture site demonstrating fatigue failure was described by Jones, and the district court properly concluded this was based on his knowledge, an appropriate subject for lay opinion.

The ruling of the district court and the deference due it must be considered in light of the evident fact that this is a nation where many individuals grow up with extensive mechanical experience and capabilities.  Repairing household machinery, automobiles and farm equipment is a central part of

life for many individuals, from early to late years, either vocationally or avocationally.  Fatigue failure of metal is not unfamiliar to such persons.  The testimony given by Jones explaining his background fits squarely into this pattern as the district judge recognized.

Textual support for Jones's opinions can be found in 8 Am. Jur. Proof of Facts <u>Metal Failure</u> 127 (1960 & Supp. 1994), which states that, after a number of cycles of stress, a small crack may form in the metal where the stress is highest and, under continued stress, grow until the metal fractures from overload.  <u>Id.</u> at 129.  Proof of Facts outlines the signs of metal fatigue, including the fracture pattern on the broken surfaces and the presence of stress raisers such as threads and holes.  <u>Id.</u> at 130-31.  Proof of Facts describes the markings on fracture surfaces as follows:

> A fatigue fracture will often show a characteristic pattern on the fracture surfaces.  Frequently there will be two areas that are markedly different in appearance. This is because only a portion fractured from fatigue, the remainder failing from overload. The fatigue portion will often be <u>shiny</u> and will often contain conchoidal or "clam shell" markings which indicate the position of the crack at the various stages of its progression.  The overload portion, on the other hand, will generally be <u>duller</u> and will show some ductility or plastic deformation.

<u>Id.</u> at 145 (emphasis added).  While Jones did not testify about

clam shell markings, he did carefully explain the differing

colors of the metal, indicating the development of the fracture,

the overstressing of the metal, and the final parting at the

fracture surface.

          The text discusses the use of experts in analyzing

fatigue factors, but closes with the following observation:

> While the aid of competent
> professional help is important in
> explaining the failure from a
> scientific standpoint, the
> assistance that may be given by
> persons qualified by training and
> experience in a particular trade or
> craft should not be overlooked.
> For example, a knowledge of the
> properties and characteristics of
> metals is essential to a blacksmith
> or welder, and either may have
> acquired by experience a knowledge
> as to the dangerous conditions in
> metals brought about by surface
> irregularities, notches, tool marks
> and the like.  Similarly, a
> mechanic experienced in working
> with trailers would be qualified to
> testify as to the dangers inherent
> in a loose trailer hitch, and an
> elevator repairman may speak
> authoritatively concerning
> experience in the industry with
> cable failures and the standard
> practice of periodically cutting
> off and discarding a length of
> cable to avoid failures.

<u>Id.</u> at 137.  Jones's testimony is just such an example.

          The Court's opinion, with its abundance of

scholarly reasoning, proves self-defeating.  In essence, the

Court simply examines Jones's qualifications as an expert, points to his experience and opines that Jones's experience has nothing to do with designing or evaluating the design of machinery. Supra at 35. However, design was not the central point of Jones's testimony. Although Jones testified that he "had never seen a cylinder that size configured that way," see App. at 167, the central thrust of his testimony concerned his observations of the fracture itself and his opinion that this caused the collapse of the lift boom.[28]

The Court also points out the deficiencies of Jones's formal education: that he had taken no courses in metallurgy, material failure or metal fatigue, had not designed a hydraulic cylinder, and had but one year of college education with no studies in material compositions. Supra at 32. These comments might bear on the qualification of Jones to give expert opinions under Rule 702, but they do not reach the practical

---

[6]. The Court characterizes Jones's opinion as stating that "the fracture was caused by metal fatigue and was attributable to the design of the rod end." Supra at 6. The Court later characterizes the issue in the case as "whether it was permissible for Jones to express the opinion that the rod end had broken due to metal fatigue and that the design of the rod end was a 'problem.'" Supra at 32. The Court then determines that Jones was not qualified to express an opinion on whether the rod end was defectively designed. Supra at 33-35. The Court's characterization carries Jones's testimony beyond that which his spoken words will support. In substance, Jones described a fatigue fracture which occurred at the rod's weakest point, where it was drilled through and threaded. I read Jones's testimony to express an opinion on causation, but not on defective design.

experience and knowledge that qualify Jones to express a lay opinion. Compare FED. R. EVID. 701 and FED. R. EVID. 702.

Rule 701 does not require technical knowledge or expertise but, rather, requires that lay opinion be rationally based on the witness's own perceptions, i.e. "the familiar requirement of first-hand knowledge or observation." FED. R. EVID. 701 advisory committee's note. Jones's opinion was based on first-hand observation of the fractured rod. From a distance of approximately 15 inches, he observed the differing colorations of the metal fracture surface and saw that the rod broke in a threaded area with a hole in it. He had ample opportunity to observe the fracture and to form his opinion.

In Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 404 (3d Cir. 1980), the Court observed that the essential difference between lay and expert opinion evidence is that the expert may answer hypothetical questions, whereas the lay witness may testify only from facts perceived by him, not those "made known to him at or before the hearing." Id.; FED. R. EVID. 703. See also In re Merritt Logan, Inc., 901 F.2d 349, 359-60 (3d Cir. 1990). Jones was not asked hypothetical questions, he did not express expert opinions, and his testimony was not admitted on that basis.

When evidence is admitted under Rule 701, "cross-examination and argument will point up the weakness," id., and the jury will weigh the lay opinion testimony in light of any

countervailing evidence.  Benton Harbor's counsel scrutinized Jones's training and experience on cross-examination and read excerpts to the jury which highlighted those issues.  Jones's lack of formal training should not prevent the admission of his opinion.  See United States v. Myers, 972 F.2d 1566, 1577 (11th Cir. 1992) (admitting lay opinion testimony that a stun gun caused burn marks based on the witness's perception of the burned skin and 19 years of police experience; holding that the opinion's lack of a technical/medical basis could be exposed on cross-examination and affected the weight, not the admissibility, of the evidence), cert. denied, 113 S. Ct. 1813 (1993); Joy Mfg., 697 F.2d at 112 (holding that inability to state precisely why product was inoperable did not prevent lay testimony that product was inoperable but, rather, was "proper material for effective cross-examination").  Based upon Jones's experience, the district court could properly conclude that Jones was qualified to express these opinions.  Any shortcomings or weaknesses of the testimony could have been developed on cross-examination.  As the district judge cogently observed, the issue was not one of possessing a sheepskin, but rather of possessing common experience.  Even with flaws in reasoning, a district judge may properly conclude that "hearing the . . . testimony and assessing its flaws was an important part of assessing what conclusion was correct and may certainly still believe that a jury attempting to reach an accurate result should consider the evidence."  In re Paoli R.R.

Yard PCB Litig., 35 F.3d 717, 745 (3d Cir. 1994) (discussing Daubert, 113 S. Ct. 2786, and the requirements for expert testimony), cert. denied, 115 S. Ct. 1253 (1995).

The Court today appears to recognize and generally to limit the application of Rule 701 to human appearance, human conditions, and, perhaps, vehicle speed and property value. This should not be the extent of permissible lay testimony. Jones's testimony that metal fatigue caused the fracture and the accident is more evocative and understandable than a long physical description of the rod's outward appearance, although Jones offered both. The Court quotes the following from United States v. Yazzie, 976 F.2d 1252, 1255 (9th Cir. 1992), a case which involved lay opinion on whether a rape victim appeared to be fifteen or sixteen years old:

> "If it is impossible or difficult to reproduce the data observed by the witnesses, or the facts are difficult of explanation, or complex, or are of a combination of circumstances and appearances which cannot be adequately described and presented with the force and clearness as they appeared to the witness, the witness may state his impressions and opinions based upon what he observed."

Id. at 1255 (allowing lay opinion testimony) (quoting United States v. Skeet, 665 F.2d 983, 985 (9th Cir. 1982)). These general principles apply equally to Jones's testimony. See also Eckert v. Aliquippa & S. R.R. Co., 828 F.2d 183, 185 n.5 (3d Cir. 1987) (cited with approval by the Court and allowing lay opinion

testimony as to whether an accident would have occurred had the railroad cars involved coupled properly).

In determining the propriety of lay opinion, other courts have considered: (1) whether the witness has personal knowledge of the facts from which the opinion was derived; (2) whether the opinion is rationally supported, i.e. "apparent to a 'normal person' in [the witness's] position;" and (3) whether the opinion is helpful to the trier of fact. Soden v. Freightliner Corp., 714 F.2d 498, 511-12 (5th Cir. 1983) (citing Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc., 630 F.2d 250, 263 (5th Cir. 1980)). Jones's testimony is not unlike that at issue in Soden and meets the standards articulated by Soden.

The Court here argues that "cases like Soden stretch the doctrinal boundaries of Rule 701 opinion testimony." Supra at 22. The witness in Soden, Lasere, was a service manager in charge of the maintenance of trucks, and his qualifications closely parallel those of Jones.[29] Lasere testified that a step bracket located near the fuel tank caused holes in the tank and that this design was dangerous. Id. at 510-11. The Fifth Circuit stated that Lasere's opinion was one that "may have been more properly made by one more formally an expert," id. at 512,

_____

[7]. The Court today accepts Lasere's knowledge and qualifications but rejects those of Jones. Certainly, the fact that Lasere had eighteen years experience and Jones ten is not sufficient basis to distinguish the two. This only serves to illustrate that this determination is one of degree, properly decided by the district judge in the exercise of discretion.

but that his opinion was adequately grounded in his own experience and observation.  Likewise, Jones based his opinion of causation on his examination of the rod, the different coloration, and the fact that the break occurred near a drilled hole in a threaded area.  The court in Soden commented that Lasere's testimony on causation was rationally supported and "would have been apparent to a 'normal person' in his position."  Id.  This applies equally to Jones's opinion.  The court in Soden expressed reservation only as to Lasere's testimony that the situation was dangerous.  However, this final step in Lasere's testimony is not matched by a similar opinion of dangerousness by Jones.  Thus, rather than this case exceeding the scope of Soden, Jones's observations and opinions are squarely supported by Soden's reasoning.

The district court reached a different conclusion on Jones's competence to testify as a lay witness than would this Court.  However, this should not be dispositive unless there is an abuse of discretion.

Professor Wigmore comments that the true theory of the opinion rule is simply to reject superfluous evidence.  7 JOHN HENRY WIGMORE, EVIDENCE § 1918, at 11 (James Chadbourn rev. 1978).  Wigmore's text quotes from Cornell v. Green, 10 S. & R. 14, 16 (Pa. 1823), stating that when the facts from which the lay witness "received an impression are too evanescent in their nature to be recollected, or are too complicated to be separated

and distinctly narrated, his impressions from these facts become evidence."  Id. at § 1924, at 33.  Wigmore concludes that: "[w]hat is chiefly wrong is by no means the test itself, but the illiberal and quibbling application of it."  Id.

The Court states that it can find no reported case where a lay witness testified regarding metal fatigue.  However, none of the cases cited in footnote 22 of the Court's opinion deal with the admissibility of opinion evidence.[30]  Further, Salter v. Westra, 904 F.2d 1517, 1525 (11th Cir. 1990) (cited by the majority in footnote 22), discusses not only expert testimony, but lay testimony of a mechanic describing the fracture surfaces of the lug bolts with the evident corrosion and rust streaks.[31]

---

[8].  The fact that "experts have testified (and disagreed) as to whether metal fatigue could be detected," supra at 33, is not relevant here.  None of the cases cited by the Court involving expert opinion on metal fatigue remove such testimony from the realm of lay opinion.  See Fusco v General Motors Corp., 11 F.3d 259, 261 (1st Cir. 1993) (noting experts' disagreement on whether fatigue or impact caused fracture); Marrocco v. General Motors Corp., 966 F.2d 220, 225 (7th Cir. 1992) (noting experts' agreement that loss of allegedly defective component precluded evaluation of possible defects, including fatigue); Salter v. Westra, 904 F.2d 1517, 1520 (11th Cir. 1990) (noting experts' disagreement as to cause of accident where their opinions "relied heavily upon the mechanic's description of the physical state of the wheels and the tire hub before he repaired them"); Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784, 789 (6th Cir. 1984) (noting expert testimony that metal fatigue caused fracture).  Most tellingly, these opinions each deal with issues other than the admissibility of this evidence.

[9].  See also Sullivan v. Rowan Companies, Inc., 952 F.2d 141, 145-46 (5th Cir. 1992), where the district court ruled that a witness was not qualified to testify as an expert on metallurgy, but allowed him to testify as a lay witness under Rule 701 on his

In distinguishing Rule 701 and Rule 702 evidence, we should recognize that the expert with impressive credentials comes before a jury with an aura unmatched by most lay witnesses. We also must recognize that the jury may weigh either lay opinion testimony or expert testimony and find it wanting. In the case before us however, the district court, after a painstaking study of the deposition testimony, determined that Jones's testimony was properly admissible as lay opinion, and that the jury should be the arbiter of its weight and value.

The district court did not abuse its discretion in admitting Jones's testimony under Rule 701.

(..continued)
observations from microscopic examination and testing of a socket which split in half. The court did not allow the witness to opine whether the socket was defective or why it failed, but commented that a contrary decision would not necessarily have required reversal. Id. at 146.